Argued and submitted May 4, 1992, decision of Court of Appeals affirmed on different grounds; judgment of circuit court affirmed July 1, 1993

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## JOSEPH ELWOOD EHLY,
*Petitioner on Review.*

(CC 89-CR-0958-TM; CA A63346; SC S38790)

854 P2d 421

Peter Gartlan, Deputy Public Defender, Salem, argued the cause for petitioner on review. With him on the petition was Sally L. Avera, Public Defender, Salem.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the response to the petition were Charles S. Crookham, Attorney General, Virginia L. Linder, Solicitor General, and Jas. Adams, Assistant Attorney General, Salem.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Defendant appeals his convictions for being a felon in possession of a firearm, ORS 166.270(1), and for unlawful possession of a controlled substance, ORS 475.992(4)(b). He contends that the trial court erred in denying his motion to suppress evidence that police officers seized after they responded to a call for assistance from a motel manager. The Court of Appeals affirmed. *State v. Ehly*, 109 Or App 456, 819 P2d 1386 (1991). We also affirm on different grounds.

Evert, the manager of a motel in Bend, became concerned when defendant failed to check out of a motel room by the scheduled noon check out time and refused to give motel housekeepers access to the room. Evert had been told by the housekeepers that defendant had been abusive to them earlier that morning, "cussing at them through the door." Evert also was aware that defendant and some other persons had rented a room in another motel in Bend a few days earlier and that that room had been found "trashed" after defendant checked out. Evert telephoned defendant and told him that he must vacate the room by 12:15 p.m. and that he must pay his telephone charges and return the room key. When defendant responded abusively, Evert suspected that he might have trouble getting defendant to leave. Evert asked his wife to call the police for assistance.

Fifteen minutes later, Evert went to the motel room "to protect the property from damage and to collect the room key." He discovered defendant with two women, who acted as if they were hiding something. One woman immediately went into the bathroom and flushed the toilet; the other woman left. The motel room had been "trashed." The room was very "messy, and there was garbage lying all over the place, and it looked like some damage had been done." The bedspread had been slashed, heavy pieces of furniture had been moved, and food was spilled on the floor, drapes, and window area. Evert described defendant as being "semi-coherent," "belligerent[,] and nervous." Because of defendant's demeanor, Evert believed that defendant was under the influence of drugs.

Evert told defendant that he owed about $15 for telephone charges and asked for the key. The woman who had

remained with defendant went outside, returned, and gave the manager $10. Defendant told Evert that he did not have the key, but that he would leave. Evert told defendant that he was free to leave, but that Evert intended to hold two bags as security for payment of the remainder of the telephone bill and the return of the key. *See* ORS 87.156(1) (innkeeper's lien).

Police officers Cleaves and Emerson soon arrived at the motel in response to what they characterized as a report that there was "a possible altercation in progress" with the manager of the motel involving defendant and two other persons who were in the room.[1] The officers were in uniform and arrived in a marked police car. As the officers entered the motel parking lot, they saw a man whom they knew to be Gene Gammond, and whom they also knew might be armed with an automatic handgun, leaving with an unidentified woman in a car. They knew that defendant had been seen with Gammond the day before and that the two men were friends who had been "running together."

As the officers entered the motel room, they observed Evert and defendant arguing. Defendant was "very nervous, very anxious." The officers knew that defendant was a methamphetamine user, and they believed that he was under the influence of methamphetamine at that time.[2] They also knew that defendant had prior felony convictions.

---

[1] Corporal Cleaves had 19 years' experience in law enforcement and Officer Emerson had 16 years' experience. Both officers had extensive education, training, and experience in the enforcement of criminal laws pertaining to the unlawful use of controlled substances.

[2] At the suppression hearing, Corporal Cleaves testified:

"Q [BY PROSECUTOR]: Okay. Did you have an opportunity to observe [defendant]?

"A [BY CORPORAL CLEAVES]: I did.

"Q: How? How close were you to him?

"A: Within two to three feet.

"Q: Okay. Could you describe his demeanor when you arrived please?

"A: He was very nervous, very anxious. In fact, he picked up his two bags and was ready to leave.

"Q: Now throughout your encounter with him, did you speak with him?

"A: Yes.

"Q: Did you have an opportunity to observe his mannerisms, his behavior, that sort of thing?

"A: I did.

Evert told the officers that the problem was that defendant was not "vacating the room." The officers told Evert to "stand back," and he did. The officers then told defendant that he would have to leave. Defendant picked up the two bags and walked toward the door. The officers did not block the door or try in any way to prevent defendant from leaving. Defendant was not under arrest and, as far as the officers were concerned, he had not committed any crime. Defendant was not threatened and no physical force was used against him. Evert told the officers that he wanted the key and that defendant had told him, "It must be in my bags." The officers asked defendant to give Evert the key. Defendant responded that the key might be in one of the bags, but that the bags were not his; that they belonged to "a friend." When defendant did not produce the key, Corporal Cleaves asked, "Well, why don't we walk over here to the bed?" Defendant walked over to the bed and set the bags down. Cleaves asked defendant to try to find the key. Defendant agreed.[3] The

---

"Q: All right. Were you able to form any opinion as to whether you believed he was under the influence of any type of drug?

"A: I did.

"Q: What was your opinion?

"A: It was my opinion that he was under the influence of methamphetamine.

"Q: Why do you say that?

"A: Prior knowledge that [defendant] is a methamphetamine user. Also, he distributed [sic] all the behaviors of someone under the influence. He was very nervous, very anxious. During our conversation, at different points, we asked him to go ahead and have a seat in the room, at which time he would stand up. He would sit down; he would stand up.

"* * * * *

"Q: All right. In your training and experience, were the symptoms that [defendant] — that was — were — was exhibiting, are those consistent with methamphetamine use?

"A: Yes."

[3] At the suppression hearing, Corporal Cleaves testified:

"Q [BY PROSECUTOR]: Now when you first got to the hotel room and were trying to resolve this problem, was [defendant] under arrest?

"A [BY CORPORAL CLEAVES]: No.

"Q: Had he committed any crime that you were aware of at that point in time?

"A: No.

"Q: Was he asked for the room key?

officers then stood back while defendant opened and began rummaging with one hand through the smaller of the two bags, a gym bag about 18 inches wide and 24 inches long. Defendant then put both his hands into the gym bag and continued rummaging through it. Defendant's hands were concealed as he continued to rummage through the gym bag.

At that time, Corporal Cleaves became very concerned that there might be a gun in the gym bag. They knew that defendant's friend Gammond, who they believed was carrying an automatic handgun, had just left the motel. Officer Emerson then asked defendant why he did not simply dump the gym bag's contents on the bed and look for the key. Defendant did not respond to Emerson's question; he continued to rummage through the gym bag with both his hands concealed. At that time, Corporal Cleaves suspected that defendant was reaching for a gun.[4]

---

"A: Yes.

"Q: Okay. * * * What was his response?

"A: At first he — I believe he did say that he didn't have the keys. I think we asked him again. He said: well, possibly they were in his bag.

"Q: What would you have done if [defendant] had refused to give up the key or told you he hadn't had — he didn't have it?

"A: Probably just let him go."

[4] At the hearing, Corporal Cleaves testified:

"Q [BY PROSECUTOR]: Now you've already stated you were familiar with [defendant] before this. How about Gene Gammond? Had you heard that name before?

"A [BY CORPORAL CLEAVES]: Yes.

"Q: How did you know these two individuals?

"A: From prior contacts and prior arrests. We had also had information; we knew that they were friends. We had seen them together. We also had information that Gene Gammond possessed a small automatic handgun.

"Q: Well that leads me to my next question: Did you have any reason to believe that either the Defendant or Gene Gammond would be armed when you went to the Woodstone Inn?

"A: Yes.

"Q: Why?

"A: Our detectives had given us briefings that Gene Gammond was in possession of a small automatic handgun.

"Q: What were you thinking when [defendant] was reaching into the bag and you couldn't see his hands?

"A: Thought he had a gun.

Corporal Cleaves then put her hand on her gun and ordered defendant to "back up." She then grabbed the gym bag and dumped its contents on the bed. A loaded .32 automatic handgun fell out of the gym bag. Other things, including clothing, papers, letters, and personal belongings also fell out of the gym bag. Many of those items had defendant's name on them. Corporal Cleaves seized the handgun. Corporal Cleaves then arrested defendant for being a felon in possession of a firearm. ORS 166.270(1).[5]

Corporal Cleaves then asked defendant to dump the contents of the second bag on the bed. Defendant said that the bag belonged to someone else, but he emptied it anyway. The

---

"Q: Why?

"A: I've known numerous other people who use narcotics to be in possession of handguns.

"Q: This particular occasion, why is it that you felt that you were in danger?

"A: His behavior. I knew that he was under the influence and I wasn't comfortable. I was very nervous about his hands being inside the bag, and I didn't know what he was doing."

[5] At the suppression hearing, Corporal Cleaves testified:

"Q [BY THE PROSECUTOR]: Corporal Cleaves, was [defendant] asked to produce the key, or ordered to produce the key?

"A [BY CORPORAL CLEAVES]: He was asked.

"Q: Was he told, at any point, that he couldn't leave if he didn't produce the key?

"A: No.

"Q: Was he told that he would be placed under arrest if he couldn't produce it?

"A: No.

"Q: * * * [W]hat action would you have taken if [defendant] had told you he did not know the whereabouts of the key?

"A: There wouldn't have been anything that we could do.

"Q: Is it fair to say that that would have been a problem between the motel and [defendant], at that point?

"A: Yes, it would have been civil.

"Q: He wouldn't have been detained?

"A: That's correct.

"Q: Did you have any intention of looking in either of [defendant's] bags, opening either of those bags, before the Defendant opened the bag and put his -- both of his hands in the bag?

"A: No."

officers then noticed a "baggie" of a suspected controlled substance — it proved to be methamphetamine — on the bed that had not been there before, which they seized. After the gun and the methamphetamine were discovered, defendant volunteered to the officers that the gun and the other contents of the bags belong to "a friend of his." The officers then arrested defendant for being a felon in possession of a firearm.

Before trial, defendant moved to suppress the handgun and the methamphetamine, arguing that a search had been carried out without consent or probable cause.[6]

At the conclusion of the hearing, the trial court summarized the evidence as follows:

> "[T]he police officers came into the room; the Defendant was free to go, he was not in custody. The police said he could go. On the way out, they requested that he give the key. At that point, he voluntarily put his hands in the bag. At that point, based on all the things: the Defendant being intoxicated, running with Mr. Gammond, his intoxicated state, the report of the semi-automatic pistol being in the possession of Mr. Gammond, the Defendant's background, the — Gammond's background, all these things led the officers to be wary of their — what was going to happen next, and that they were justifiably concerned about their safety. And [the Corporal] was entirely justified in dumping out the bag, and at that point the weapon came out, and at that point, the key wasn't there, and then the officer asked what was in the other bag; and then the Defendant voluntarily dumped the other bag, and, at that point, as the items were being placed back in the bag, the substance which was found, which is the contention of the possession of the controlled substance, was then found."

---

[6] At the hearing, defendant told the court that neither of the two bags that he had with him in the motel room was his. The state, however, did not argue at trial or in the Court of Appeals that defendant lacked standing to challenge the seizure or search of the bags. At trial, defendant moved for a judgment of acquittal, arguing that the evidence was insufficient to prove that he "possessed" either of the bags, the gun found in the gym bag, or the methamphetamine found in the second bag. Not until sentencing in this case did defendant claim any interest in the bags. At that time, he asked for the return of some of the items found in the bags.

On review, the state argues for the first time that, even if someone's personal rights were violated by the search of the bags, defendant's rights were not. We need not reach that argument, however, because we affirm the trial court's judgment on different grounds.

The court then stated:

> "I'm not going to reiterate all the facts that I [summarized above], but those facts stand as my conclusions. I'll also find that although the Defendant was somewhat intoxicated, he was not so intoxicated he did not understand what was going on. He seems to have a clear memory of what happened, but certainly it stands, from my interpretation of the evidence, that he was in an intoxicated state, and by the officers' testimony it appeared to be that of drugs. I further find that it was the Defendant who volunteered to place his hands into the bag initially, and certainly the officer — both officers were well justified, based on training and all the factors which I have indicated heretofore, that they were justified in being concerned about their safety, and the immediate dumping out of the bag seems to be the only reasonable action the police officers could have taken, at that point, to insure their safety, at that time, they found the weapon. I'll further find that the Defendant was freely given the opportunity to disclose the contents of the second bag, and that given the opportunity, he dumped those, and, I might add, it was only after the police officer was helping him put the stuff back in, that they found this container that apparently had methamphetamine. The Defendant was not in custody, he volunteered to go into his bag to retrieve the keys, and if he was not free to leave, it was his choice on whether he wanted to disclose the contents or not, and for those reasons I deny the Defendant's Motion to Suppress."

Accordingly, the court denied defendant's motion to suppress. After a trial to the court, defendant was found guilty of both charges.

The Court of Appeals affirmed, concluding that defendant was not stopped until after the officers discovered the gun and that the officers' actions in seizing and searching the gym bag were justified because of their well-justified concern for their safety. *State v. Ehly, supra.* We allowed defendant's petition for review. On review, defendant contends that the trial court erred in denying his motion to suppress. He makes essentially the same arguments on review that he made below. We affirm the decision of the Court of Appeals on different grounds.

■ Determination of the legality of searches and seizures depends largely on the facts of each case. *State v. Warner*, 284 Or 147, 149, 585 P2d 681 (1978). What actually

happened is a question of fact for the trial court. A trial court's findings of historical fact are binding on appellate courts if there is constitutionally sufficient evidence in the record to support those findings. *Ball v. Gladden*, 250 Or 485, 487-88, 443 P2d 621 (1968). Our function is to decide whether the trial court applied legal principles correctly to those facts. *State v. Davis*, 295 Or 227, 238, 666 P2d 802 (1983). If findings of historical fact are not made on all pertinent issues and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the court's ultimate conclusion. *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991).

We follow our usual methodology of first examining the statutory issues and then addressing the constitutional issues that remain after the statutory questions have been answered. *See State v. Kennedy*, 295 Or 260, 262-65, 666 P2d 1316 (1983) (explaining methodology). Our first task is to determine the nature of the initial encounter between defendant and the officers.[7] In *State v. Warner, supra*, 284 Or at 161, this court stated:

> "[T]here are three generally recognized categories of street encounters between policeman and citizen. In descending order of justification, they are: (1) arrest, justified only by probable cause; (2) temporary restraint of the citizen's liberty (a 'stop'), justified by reasonable suspicion (or reliable indicia) of the citizen's criminal activity; and (3) questioning without any restraint of liberty (mere conversation), requiring no justification." (Footnote omitted.)

*See State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991) (same).

---

[7] In *State v. Holmes*, 311 Or 400, 406-07, 813 P2d 28 (1991), this court commented:

"There potentially is an infinite variety of encounters between law enforcement officers and citizens. Not every such encounter constitutes a 'seizure' of the citizen within the meaning of Article I, section 9. Encounters may range from friendly exchanges of pleasantries or mutually helpful information to hostile confrontations of armed persons involving arrests, injuries, or even loss of life. Some encounters begin in a friendly, voluntary, noncoercive atmosphere, but take a different direction upon the injection of some unexpected element into the encounter."

*See also Terry v. Ohio*, 392 US 1, 13, 88 S Ct 1868, 20 L Ed 2d 889 (1968) (same).

ORS 131.615(1) provides:

"A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry."

As used in ORS 131.615(1), "reasonably suspects" means that a peace officer "holds a belief that is reasonable under the totality of the circumstances existing at the time and place the officer acts." ORS 131.605(4). *See State v. Lichty*, 313 Or 579, 584, 835 P2d 904 (1992) (discussing standard for reasonable suspicion to make a stop). As used in ORS 131.615(1), a "stop" is a temporary restraint of a person's liberty by a peace officer lawfully present in any place. ORS 131.605(5).[8] *See* 1 Criminal Law (Oregon CLE 1986 and Supp 1990) (Stop and Frisk).

■ Defendant first argues that, when the officers asked him to try to find the key and to dump the gym bag's contents on the bed, he was stopped unlawfully. The trial court found that when the officers first encountered defendant, they asked defendant to leave. They did not physically block his path. They did not touch him. "Defendant was free to go, he was not in custody. The police said he could go." The court further found that, as defendant started to leave, the officers asked him to give them the key. "The Defendant was not in custody, he volunteered to go into his bag to retrieve the keys [*sic*] * * *. At that point, he voluntarily put his hands in the [gym] bag." There is evidence in the record to support those findings, and we are bound by them.

Defendant argues that the officers' requests were "poorly disguised commands." Defendant, however, points to nothing about the officers' demeanor, their tone of voice, the nature of their language, or the time, place, or manner of the encounter that supports his claim that in those circumstances a reasonable person would have believed that his liberty had been temporarily restrained by the officers. ORS 131.605(5). The totality of the circumstances here shows a conversation without any restraint of liberty, *i.e.*, a mere

_____

[8] The analysis of a defendant's rights under ORS 131.605 to 131.625 is substantially the same as the analysis of rights under Article I, section 9, of the Oregon Constitution. *State v. Kennedy*, 290 Or 493, 497, 624 P2d 99 (1981).

conversation, a noncoercive encounter, requiring no justification. *State v. Holmes, supra; State v. Warner, supra.* We agree with the trial court and the Court of Appeals that defendant was not stopped at that time. *See State v. Kennedy, supra,* 290 Or at 498 (a police officer may approach a citizen, identify himself or herself as an officer, and ask some preliminary questions without making a "stop").

■ Defendant next argues that, when the officers asked him to try to find the key and to dump the gym bag's contents on the bed, he was "seized" for purposes of Article I, section 9, of the Oregon Constitution.[9] In *State v. Holmes, supra,* 311 Or at 409-10, this court held:

> "[A] 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances.
>
> "* * * * *
>
> "Under these 'seizure' standards, law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful. A street or public place encounter does not amount to an Article I, section 9 'seizure' merely because the encounter may involve inconvenience or annoyance for the citizen and the other party to the encounter is known to be a law enforcement officer. Even physical contact does not transform the encounter into a 'seizure' if it is a normal means of attracting a person's attention (*e.g.*, policeman tapping citizen on the shoulder at the outset to get a citizen's attention). *See* LaFave, 3 Search and Seizure, A Treatise on the Fourth Amendment 413, § 9.2(h) (2d ed 1987). Rather, the encounter is a 'seizure' of a

---

[9] Article I, section 9, provides in part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; * * *[.]"

This court has stated that a "stop," as used in ORS 131.615, is a "seizure" under Article I, section 9, of the Oregon Constitution, and the federal constitution's Fourth Amendment. *State v. Holmes, supra,* 311 Or at 408 n 18; *State v. Kennedy, supra,* 290 Or at 497.

person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens." (Footnote omitted.)[10]

The determination whether a person has been "seized" under Article I, section 9, requires a fact-specific inquiry into the totality of the circumstances of the particular case. *State v. Holmes, supra*, 311 Or at 408.

In this case, when the officers first entered the motel room, they asked defendant to leave. When they asked defendant to try to find the key and later asked him to dump the gym bag's contents on the bed, the officers did not significantly restrict, interfere with, or otherwise deprive defendant of his liberty or freedom of movement. To the contrary, the officers testified that, if defendant had refused to give them the key or told them that he did not have it, they would have let him go. The trial court believed the officers.

Considering the totality of the circumstances, we conclude that any interference with defendant's liberty or freedom of movement was not significant. Rather, the encounter was mere conversation at that point, requiring no justification. Indeed, we believe that it would be anomalous to conclude that a request of this nature made by officers whose avowed intent was to get a person to leave the premises constituted a "seizure" of that person. *State v. Kennedy, supra*, 290 Or at 498. We conclude that the officers had not intentionally and significantly restricted or interfered with defendant's liberty for purposes of Article I, section 9. *State v. Holmes, supra; State v. Warner, supra.*

Defendant argues, however, that when the officers asked him to try to find the key and later asked him to dump

---

[10] Any test intended to determine what constitutes a seizure of a person must be expressed in terms that can be understood and applied by the officer. The "objectively reasonable" requirement in part (b) of our formulation furthers that purpose. An officer should be responsible only for anticipating the effects of his or her action on an objectively reasonable person, *i.e.*, the officer must be able to treat the individual with whom the officer is dealing as an objectively reasonable person. *State v. Holmes, supra*, 311 Or at 410 n 19.

the gym bag's contents on the bed and look for the key, he *did not believe* that he was free to leave. In *State v. Holmes, supra,* 311 Or at 410, this court stated that an encounter is a "seizure" of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries that a private citizen would not, has otherwise conducted himself or herself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens. *Ibid.*

We proceed to consider whether defendant's asserted belief was objectively reasonable under the circumstances. As noted, the trial court found that defendant "was free to go, he was not in custody." The court also found that the officers had not, by words or actions, prevented defendant from leaving the motel room. Those findings are supported by evidence in the record. *See id.* at 411 (an objectively reasonable person would not believe that officer's actions in directing motorist to stop in order to direct car around accident scene was a significant restriction on the defendant's liberty); *State v. Gerrish,* 311 Or 506, 815 P2d 1244 (1991) (police officer gathering information about a robbery and shooting, who by use of overhead lights signaled motorist to stop, did not seize the motorist for purposes of Article I, section 9). Defendant had not been "seized" when he was asked to look for the key.

We proceed to consider whether defendant was stopped and thus was "seized" *later* in the encounter. The Court of Appeals concluded that defendant was not stopped or seized until *after* the officers saw the gun on the bed. *State v. Ehly, supra,* 109 Or App at 462. During oral argument in this court, the state conceded, and we agree, that defendant was stopped and thus was "seized" when Corporal Cleaves put her hand on her gun and ordered defendant to "back up," and he submitted to that show of police authority.

■ For that stop and seizure to have been lawful, the officers must have "reasonably suspected," *i.e.,* must have held a belief that was objectively reasonable under the totality of the circumstances existing at that time and place, that defendant had committed a crime. ORS 131.605(4), 131.615. The question is whether, under all the circumstances, the

facts known to the officers were sufficient to give the officers a reasonable suspicion that defendant had committed a crime.

 We first address the standard for reasonable suspicion under ORS 131.615. The statutory standard for the stopping and questioning of a person concerning his or her possible criminal activity was intended to be less than the standard for probable cause to arrest. *State v. Valdez*, 277 Or 621, 628, 561 P2d 1006 (1977).[11] The standard is reasonable suspicion, and it requires an objective test of observable facts. *Id.* at 629; *State v. Tucker*, 286 Or 485, 495, 595 P2d 1364 (1979). Whether the suspicion is reasonable often will depend on the inferences drawn from the particular circumstances confronting the officer, viewed in the light of the officer's experience. *Terry v. Ohio*, 392 US 1, 21-22, 27-30, 86 S Ct 1868, 20 L Ed 2d 889 (1968). If a police officer is able to point to specific and articulable facts that give rise to a reasonable inference that a person has committed a crime, the officer has "reasonable suspicion" and hence may stop the person for investigation. *State v. Valdez, supra*, 277 Or at 626 (quoting the commentaries of the Criminal Law Revision Commission, which drafted ORS 131.615 *et seq*).

Applying the reasonable suspicion standard to the facts in this case, the specific and articulable facts that support the officers' reasonable inference that defendant had committed a crime are the following: Immediately before Corporal Cleaves put her hand on her gun and ordered defendant to "back up," the officers were confronted by a person whom they knew had prior felony convictions, whom they knew to be a methamphetamine user, and who appeared at that time to be under the influence of methamphetamine. Corporal Cleaves knew that many people who use illegal narcotics possess guns. When she saw defendant reaching into the gym bag with both his hands concealed, she thought that he had a gun. The officer knew that defendant was a friend of Gene Gammond and that defendant and Gammond were "running together." They also had reason to believe that Gammond was armed with an automatic handgun, and

---

[11] In *State v. Valdez, supra*, 277 Or at 625, this court stated that ORS 131.605 to 131.625 were intended to codify the "stop and frisk" policy of *Terry v. Ohio, supra*, and *State v. Cloman*, 254 Or 1, 6, 456 P2d 67 (1969) ("reasonable suspicion" is of less quantum than probable cause to arrest).

they had seen him drive out of the motel parking lot only minutes earlier. The officers reasonably could have believed that the gym bag belonged to Gammond and that it contained Gammond's automatic handgun. The gym bag was large enough to have contained a weapon. When Officer Emerson asked defendant why he did not just dump the gym bag's contents on the bed and look for the key, defendant did not respond.[12] Moreover, after telling the officers that the gym bag was not his, defendant continued to rummage through the gym bag with both his hands concealed. Considering the totality of those circumstances, we conclude that Corporal Cleaves had an objectively reasonable suspicion that defendant had committed the crime of felon in possession of a firearm. ORS 166.270. The stop and the seizure of defendant, therefore, were lawful. ORS 131.615.

Defendant next argues that, *even if* the stop was lawful, the officers' concern for their safety was not reasonable and, therefore, the *search* of the bag was not lawful.[13] We disagree.

In *State v. Bates*, 304 Or 519, 523-24, 747 P2d 991 (1987), this court held that it is not a violation of Article I, section 9, for an officer to take "reasonable steps" to protect the officer or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based on specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present. This court also noted that:

> "[I]t is not our function to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life-or-death decisions in a matter of seconds.

---

[12] At the hearing on the motion to suppress, the officers testified that when they *first* came into contact with defendant they did not think that he had committed a crime; they did not intend to hold him or to charge him with any offense; their mission was to see that he left the motel. It was only *later* during the encounter that the officers reasonably suspected that defendant was a felon in possession of a firearm.

[13] Defendant's challenge to the search of the gym bag was based solely on Article I, section 9, as construed in *State v. Bates*, 304 Or 519, 747 P2d 991 (1987). *Bates* was decided solely on state constitutional grounds. Defendant has never argued that the search of the gym bag was unlawful under ORS 131.625(1), because a "frisk" is "an external patting of a person's outer clothing," ORS 131.605(2). We, therefore, express no opinion in this case on that statutory question.

There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations. Our inquiry therefore is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made." *Id.* at 524-25.

*See State v. Riley*, 240 Or 521, 525, 402 P2d 471 (1965) (same).

In addition to the specific and articulable facts set forth above that justified the officers in stopping defendant, the fact that defendant made no response to Officer Emerson's suggestion that he simply dump the bag's contents on the bed, but continued rummaging through the gym bag with both his hands concealed, created a reasonable suspicion in the officers' minds that defendant was reaching for a gun and therefore was presently dangerous to them or other persons present. We conclude that the precautions taken by Corporal Cleaves were reasonable under the circumstances. *State v. Bates, supra.*[14]

Defendant argues that the dumping of the bag was not a "reasonable step" authorized under the *Bates* officer-safety exception because merely seizing the bag would have been sufficient to protect the officers.

▇▇▇ As this court stated in *Bates,*[15] we limit our inquiry to "whether the precautions taken were reasonable under the

---

[14] We agree with the Supreme Court of Hawaii:

"Police officers need not risk a shot in the back by returning containers which they reasonably suspect contain a dangerous weapon but may lack probable cause to seize. *See,* 3 LaFave, *Search and Seizure* § 9.4(d) at 132-133 & n. 128 (1978). As the United States Supreme Court has noted, 'the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect.' *Adams v. Williams,* 407 U.S. [143, 146, 92 S Ct 1921, 32 L Ed 2d 612 (1972)]." *State v. Ortiz,* 67 Haw 181, 187, 683 P2d 822 (1984).

*See also State v. Dickerson,* 481 NW2d 840, 851 (Minn 1992), *aff'd* ___ US ___, 113 S Ct 2130, 124 L Ed 2d 334 (1993)(Coyne, J., concurring in part, dissenting in part) (a policeman should not be compelled to ignore what his senses — whether sight, sound, smell, taste or touch — tell him in clear and unmistakable language).

[15] *State v. Bates, supra,* involved the search of defendant's automobile after the police had stopped him for a traffic infraction. In *Bates,* this court held that the officers did *not* have reasonable suspicion to believe that the defendant might pose an immediate threat of serious physical injury to them and, therefore, their instructing

circumstances as they reasonably appeared at the time that the decision was made." *Id.* at 525. Under the circumstances here, we conclude that dumping the bag's contents on the bed was a "reasonable step" to take on the grounds of officer safety. *Id.* at 524. We are not persuaded that a bright-line rule to the effect that an officer may never search an item that has been seized is appropriate. Our inquiry is whether the steps taken by an officer were reasonable under the circumstances as they appeared to the officer at the time that the decision was made. *Id.* at 524-25. *See also* 3 LaFave, Search and Seizure 527-36, § 9.4(e) (2d ed 1987) (citing cases authorizing a search beyond the person stopped).[16]

We conclude that the totality of the circumstances justified the officers' reasonable suspicion that there was a gun in the gym bag and that their safety and that of others would be at risk if they returned the gym bag to defendant unexamined. In such circumstances, the officers had a legitimate interest in searching the bag, and it was reasonable for them to do so. *State v. Bates, supra.*[17]

Defendant also argues that the officers themselves created the perceived danger here by asking him to find the key and to dump the gym bag's contents on the bed and to look for the key and, therefore, that the officer-safety rule should not apply. He relies on *State v. Matsen/Wilson*, 287 Or

the defendant to slide further into view a bag under the driver's seat was an unlawful search under Article I, section 9. Notwithstanding that result, *Bates* stands for the proposition that an officer, who has lawfully stopped a person that the officer reasonably suspects is armed and presently dangerous to the officer or other persons present, may conduct a protective search beyond the person stopped, under Article I, section 9. *Id.* at 525-27.

[16] The following statement is found in 1 Rudstein, Erlinder and Thomas, Criminal Constitutional Law § 2.07[7] (1992):

"Although the subject of an investigatory stop may not himself be armed, he may be able to gain access to a weapon located in a nearby place. Consequently, when a police officer has reason to believe that a lawfully stopped individual is dangerous and may gain immediate control of a weapon, he may conduct a search *of the area around the individual from which the individual could obtain a weapon.*" (Emphasis added; footnotes omitted.)

[17] *Cf. State v. Anfield*, 313 Or 554, 559, 836 P2d 1337 (1992) (as used in a criminal statute, ORS 166.250(1)(b), that makes it a crime to knowingly carry any firearm "upon the person," without having a license to do so, the words "upon the person" include "purses, handbags, bags, and their contents" when they are carried by the person being arrested).

581, 601 P2d 784 (1979), and *State v. Fondren*, 285 Or 361, 367, 591 P2d 1374 (1979). Defendant's reliance on those cases is misplaced. *Matsen/Wilson* and *Fondren* are not based on the officer-safety exception, but on exigent circumstances because the police feared that evidence would be moved or destroyed before a warrant could be obtained. In those cases, the police had information on drug shipments that amounted to probable cause to obtain warrants well before they seized the evidence, yet they failed to obtain warrants. This court found that the officers had time to procure warrants. The rationale behind those cases is inapplicable to circumstances such as those found here, where the officers were confronted by an immediate threat of serious physical injury.

Our next inquiry is whether the officers' actions concerning defendant violated defendant's rights under the Fourth Amendment to the Constitution of the United States.[18] Defendant argues that he was "seized" for purposes of the Fourth Amendment when the officers asked him to try to find the key and to dump the gym bag's contents on the bed.

In *Terry v. Ohio, supra*, 392 US at 19 n 16, the Supreme Court of the United States noted:

"Obviously, not all personal intercourse between policeman and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."[19]

In *United States v. Mendenhall*, 446 US 544, 554, 100 S Ct 1870, 64 L Ed 2d 497 (1980), the Supreme Court stated that a person has been seized within the meaning of the

---

[18] The Fourth Amendment provides in part:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *."

*See* Annot, *What Constitutes "Seizure" Within Meaning Of Federal Constitution's Fourth Amendment — Supreme Court Cases*, 100 L Ed 2d 981 (1990).

[19]

"[W]e deal here with an entire rubric of police conduct — necessarily swift action predicated upon the on-the-spot observations of the officer on the beat — which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Terry v. Ohio, supra*, 392 US at 20 (footnote omitted).

Fourth Amendment "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *See Michigan v. Chesternut*, 486 US 567, 573, 108 S Ct 1975, 100 L Ed 2d 565 (1988) ("The court has since embraced [the *Mendenhall*] test"). The *Mendenhall* test is an objective one, not whether the person perceived that he or she was being ordered to restrict movement, but whether the officer's words and actions would have conveyed that perception to a reasonable person. *California v. Hodari D.*, 499 US 621, 111 S Ct 1547, 113 L Ed 2d 690, 698 (1991).

In *California v. Hodari D., supra,* the Supreme Court accepted as true for the purpose of that decision that the police officer's pursuit of the defendant was a show of authority. No seizure of the defendant occurred, however, because the defendant continued to flee despite the officer's show of authority. No seizure occurs in those circumstances unless the person either submits to police authority or is caught.

In *Florida v. Bostick*, 501 US ____, 111 S Ct 2382, 115 L Ed 2d 389, 400-01 (1991), the Supreme Court held that the test of whether a seizure has occurred is whether, given the totality of the circumstances surrounding the individual encounter, "the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " 115 L Ed 2d at 400 (quoting *Michigan v. Chesternut, supra,* 486 US at 569). The Court held that merely asking questions does not turn a police-initiated encounter into a seizure. However, when the police conduct communicates to the person that he or she must comply with the police requests, then a seizure has indeed occurred:

> "As we have explained, no seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage — so long as the officers do not convey a message that compliance with their requests is required." *Id.* at 400.

*See INS v. Delgado*, 466 US 210, 104 S Ct 1758, 80 L Ed 2d 247 (1984) (questioning employees at work place about their citizenship did not constitute a seizure even though INS agents were stationed at exits while other agents questioned

workers; a reasonable person would have felt free to leave); *Florida v. Royer*, 460 US 491, 103 S Ct 1319, 75 L Ed 2d 229 (1983) (officers approaching a person meeting "drug courier profile" at airport and asking if he would speak with them did not constitute a seizure).

Applying the Supreme Court's test to the facts of this case, and taking into account all the circumstances surrounding the incident, we conclude that defendant was not "seized" for purposes of the Fourth Amendment *before* Corporal Cleaves put her hand on her gun and told him to "back up." Before that event, the officers' conduct would not have communicated to a reasonable person that he or she was not at liberty to go about his business. Defendant has advanced no reason why the outcome on this question should be different under the Fourth Amendment from that under Article I, section 9, and we can think of none.

However, when Corporal Cleaves put her hand on her gun and ordered him to "back up," and defendant submitted to that show of authority, defendant was stopped and thus was "seized" for purposes of the Fourth Amendment. For the reasons explained above, we conclude that that was a permissible "*Terry*-stop." *Terry v. Ohio, supra*, 392 US at 30; *see also Adams v. Williams*, 407 US 143, 145-46, 92 S Ct 1921, 32 L Ed 2d 612 (1972) (officer may conduct weapons search limited in scope to protective purpose).

As noted, defendant never specifically challenged the *seizure* of the gym bag. The question then is whether Corporal Cleaves was justified in dumping the gym bag's contents on the bed, *i.e.*, in searching the bag. The Supreme Court of the United States recognizes the officer-safety rule. *See Michigan v. Long*, 463 US 1032, 1049-50, 103 S Ct 3469, 77 L Ed 2d 1201 (1983) (officer-safety exception to warrant requirement allowed search of passenger compartment of car); *Pennsylvania v. Mimms*, 434 US 106, 111-12, 98 S Ct 330, 54 L Ed 2d 331 (1977) (frisk of person stopped for traffic violation allowed under officer-safety exception); *Terry v. Ohio, supra*, 392 US at 21 (officer who believed that person is armed and presently dangerous may take necessary measure to neutralize threat of harm).[20]

---

[20] "Our evaluation of the proper balance that has to be struck in this type of

For the reasons explained above in our analysis under state law, we conclude under the Fourth Amendment that on these facts Corporal Cleaves was justified in searching the gym bag on officer-safety grounds. *Michigan v. Long, supra*, 463 US at 1052; *Terry v. Ohio, supra*, 392 US at 27. Corporal Cleaves reasonably suspected that defendant had committed a crime. She also reasonably suspected that defendant was reaching for a gun and that he was presently dangerous to the officers and to others present. Corporal Cleaves' reasons were "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed]" a search of the gym bag. *Id.* Corporal Cleaves was justified in believing that defendant was armed and presently dangerous to the officers and to others present and therefore she was entitled to conduct a protective search of the gym bag.

In *Terry v. Ohio, supra*, the Supreme Court held that a "frisk" is reasonable when weighed against the need for law enforcement officers to protect themselves and others from harm in situations where they may lack probable cause for an arrest. The Court, therefore, upheld a limited search for weapons where, based on specific and articulable facts, a reasonably prudent officer would be warranted in the belief that the officer was dealing with an armed and dangerous person.[21] 392 US at 27. We believe that the reason for the search of the gym bag in this case was well within the limited purpose mandated by *Terry v. Ohio, supra*, 392 US at 26, *i.e.*,

---

case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonable prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. *Cf. Brinegar v. United States*, [338 US 160, 69 S Ct 1302, 93 L Ed 1879 (1949)]." *Terry v. Ohio, supra*, 392 US at 27 (citations omitted).

[21] "Certainly it would be unreasonable to require that police officers take unnecessary risk in the performance of their duties." *Terry v. Ohio, supra*, 392 US at 23.

that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.

In *Michigan v. Long, supra*, 463 US at 1051, the Supreme Court held that officers who had detained the driver of a car under *Terry v. Ohio, supra*, could search those parts of the car's passenger compartment where a weapon could be hidden, based on the officers' reasonable belief that the driver was dangerous and could gain access to a weapon. The subsequent seizure of marijuana, discovered in the search, was upheld. The Supreme Court held that the officers did not act unreasonably in taking preventive measures to ensure that there were no weapons within the defendant's grasp before permitting him to re-enter his automobile. *Michigan v. Long, supra*, 463 US at 1051.[22]

In *Maryland v. Buie*, 494 US 325, 110 S Ct 1093, 108 L Ed 2d 276 (1990), the Supreme Court held that a protective sweep of an entire house, beyond the scope of an arrest warrant, was permissible under a rationale similar to the officer-safety rationale in *Terry v. Ohio*. The Court stated: "[T]here must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonable prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." 494 US at 334.

■ If Corporal Cleaves had reasonably suspected that defendant had a gun on his person, she would have been justified under the Fourth Amendment in frisking him for weapons. *See Ybarra v. Illinois*, 444 US 85, 100 S Ct 338, 62 L Ed 2d 238 (1979) (valid pat-down under *Terry v. Ohio* based on reasonable belief that the person is armed and presently

---

[22]

"Where such a stop is reasonable, however, the right to frisk must be immediate and automatic if the reason for the stop is, as here, an articulable suspicion of a crime of violence. Just as a full search incident to a lawful arrest requires no additional justification, a limited frisk incident to a lawful stop must often be rapid and routine. There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet.

"* * * * *

"Once that forced encounter was justified, however, the officer's right to take suitable measures for his own safety followed automatically." *Terry v. Ohio, supra*, 392 US at 33-34 (Harlan, J., concurring).

dangerous); *Pennsylvania v. Mimms, supra,* 434 US at 106 (frisk justified on observing a bulge under stopped driver's jacket). The *rationale* underpinning the officer-safety rule recognized in *Terry v. Ohio, supra,*[23] should apply with equal force to items in a stopped person's immediate possession in which a weapon may be concealed, if the officer has a reasonable belief based on specific and articulable facts that, taken together with the rational inferences from those facts, reasonably warrants the officer's believing that the person is either armed and dangerous or may gain immediate control of a weapon. *Cf. Chimel v. California,* 395 US 752, 89 S Ct 2034, 23 L Ed 2d 685 (1969) (area of control doctrine). The Supreme Court has expressly rejected a *per se* rule that limits preventative searches to the person of a stopped person. *Michigan v. Long, supra,* 463 US at 1051.[24]

At the time that Corporal Cleaves ordered defendant to "back up," she had reasonably concluded that defendant might be armed and dangerous. Both of defendant's hands were concealed in the gym bag. Defendant had ignored the officers' suggestion that he simply dump the gym bag's contents on the bed and look for the key. The officers' concern for their safety did not evaporate the instant defendant was ordered to "back up." Defendant remained close to the bag inside the motel room. We conclude that the officers might reasonably suspect the possibility of harm if they returned the gym bag to defendant unexamined. They therefore had a right to inspect the interior of the gym bag before returning it

---

[23]

"[W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry v. Ohio, supra,* 392 US at 24.

[24] *See also United States v. Flippin,* 924 F2d 163, 167 (9th Cir 1991) (where officer knew the defendant's companion had been armed on previous day, officer's search of makeup bag was a reasonable split-second decision); *United States v. McClinnhan,* 660 F2d 500, 504 (DC Cir 1981) (search of briefcase proper because alternative of separating the defendant from briefcase would only obviate the danger for the length of the stop); *United States v. Riggs,* 474 F2d 699, 704-05 (2d Cir) *cert den* 414 US 820 (1973) (search of closed camera case at the defendant's feet permissible, where any weapon inside easily would have been accessible).

to defendant. *See Michigan v. Long, supra,* 463 US at 1051 (*Terry*-search expanded to include automobile); *State v. Gross,* 225 Neb 798, 408 NW2d 297 (1987) (search of vehicle upheld on officer-safety grounds); *State v. Ortiz,* 67 Haw 181, 683 P2d 822 (1984) (protective search of the defendant's knapsack upheld); *Williams v. State,* 19 Md App 204, 310 A2d 593 (1973) (inspection of bag on rear floor of automobile, and which seconds before had been between the defendant's feet, upheld); *People v. Pugach,* 15 NY2d 65, 255 NYS2d 833, 204 NE2d 176 (1964) *cert den* 382 US 20 (1965) (inspection of briefcase carried in the hands of person stopped upheld); *see also* LaFave, Search and Seizure 527-36, § 9.4(e) (2d ed 1987 & Supp 1992).

■ Judging the facts here against an objective standard, *Terry v. Ohio, supra,* 392 US at 21, we conclude that the facts available to the officers at the moment of the search would warrant a person of reasonable caution in the belief that the actions taken were appropriate. *Id.* at 22. *Scott v. United States,* 436 US 128, 137-38, 98 S Ct 1717, 56 L Ed 2d 168 (1978) (Fourth Amendment test is "an objective assessment of an officer's action in light of the facts and circumstances then known" to the officer). The permissible scope of a search during a *Terry* stop extends to those areas within a defendant's immediate control and that could contain a weapon. *Michigan v. Long, supra,* 463 US at 1050. *Cf. Chimel v. California, supra,* 395 US at 763 (search of arrestee's person and the "area within his immediate control" approved). The officers did not act unreasonably in dumping the gym bag's contents on the bed before allowing defendant further access to it. Rather, the search for weapons was strictly circumscribed by the exigency that justified its initiation, and it was limited to what was necessary for the discovery of weapons that might be used to harm the officers or others nearby. *Terry v. Ohio, supra,* 392 US at 25-26. The officers were not required to adopt alternative means to ensure their safety in order to avoid the intrusion involved in defendant's stop. *Michigan v. Long, supra,* 463 US at 1052. Accordingly, the search of the gym bag was permissible under the Fourth Amendment.

In summary, we conclude that defendant was not stopped or seized within the meaning of ORS 131.615(1),

Article I, section 9, of the Oregon Constitution, or the Fourth Amendment when the officers asked him to look for the key or to dump the gym bag's contents on the bed. When Corporal Cleaves put her hand on her gun and ordered defendant to "back up," she stopped and seized him within the meaning of ORS 131.615(1), Article I, section 9, and the Fourth Amendment. *State v. Bates, supra; Michigan v. Long, supra; Terry v. Ohio, supra.* Dumping the gym bag's contents on the bed did not violate defendant's rights under Article I, section 9, under *Bates, supra,* or the Fourth Amendment.

When the gun fell out, the officers had probable cause to arrest defendant for being a felon in possession of a firearm and to seize the gun incident to arrest. Because the search, if any, of the second bag was permissible as incident to a lawful arrest, it is irrelevant whether defendant consented to that search. *State v. Anfield,* 313 Or 554, 561-62, 863 P2d 1337 (1992) (search for other weapons incident to lawful arrest upheld); *State v. Owens,* 302 Or 196, 206, 729 P2d 524 (1986) (search of closed containers immediately associated with arrestee allowed if there is reasonable belief that evidence of a crime for which arrestee is arrested could be concealed there). Thus, the methamphetamine also was lawfully seized. We find no error.

The decision of the Court of Appeals is affirmed on different grounds. The judgment of the circuit court is affirmed.