Argued and submitted February 26, reversed and remanded April 1, 2009

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

WALTER DAVID VILLEMEYER,
*Defendant-Appellant.*

Washington County Circuit Court
C053849CR; A134723

205 P3d 49

Bronson D. James, Chief Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Deits, Judge pro tempore.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Defendant was convicted of delivery and possession of a controlled substance, both as commercial drug offenses, after his motion to suppress evidence was denied. On appeal, he renews the argument that he made to the trial court that police officers discovered the drugs as the result of an unlawful stop. The parties agree that the interaction between police and defendant was, in fact, a stop, and they agree that the evidence was discovered because of that stop and without attenuation. The only issue on appeal is whether, when police initiated the stop, they had reasonable suspicion that defendant had committed, or was about to commit, a crime. We hold that they did not. Accordingly, we reverse and remand.

■ We begin with the facts, because whether police have reasonable suspicion to stop a person is a fact-specific inquiry. *State v. Ehly*, 317 Or 66, 80, 854 P2d 421 (1993). On Friday, December 23, 2005, two Beaverton Police Officers, Gruber and Opitz, were driving west on Farmington Road when they noticed defendant driving in the same direction in the next lane. The officers remarked to each other on defendant's looks. He had tattoos on his neck, appeared "disheveled," and was wearing a knit stocking cap. Gruber thought that defendant had a "hardened" look, and Opitz thought that defendant looked "like a criminal" who had "be[en] in prison for a while." The officers turned off Farmington onto 158th Avenue on business unrelated to this case and lost sight of defendant's car.

After a few moments, however, the officers were in the vicinity of Farmington and 185th Avenue, and they noticed defendant's car pulling into the parking lot of a strip mall on the northwest corner of the intersection. The mall had a large grocery store as its anchor, as well as several other businesses, including an ice cream store, a restaurant, and a barbershop. The officers watched as defendant drove slowly around the parking area, pulled out of the mall, crossed Farmington, and drove into the parking area of a bank. He circled the bank parking lot and then went back across Farmington to the grocery store lot, once again circled that lot slowly, and then crossed Farmington one last time

into a small retail complex consisting of a convenience store, a bar, several other businesses, and a parking lot.

As the officers watched, defendant got out of his car and walked across Farmington, which was moderately busy at the time, and into the grocery store strip mall, adjusting the front of his stocking cap as he walked. He did not pull the cap over his face. At that point, Opitz contacted the Washington County Sheriff's Office and reported what he regarded as defendant's suspicious conduct.

Defendant approached the barbershop and pulled on the door, but it was apparently locked; the time was shortly before 10:00 a.m. He then walked a short distance toward the grocery store and made a call on his cell phone. The officers noted that there were parking spaces in the grocery store complex that were closer to the barbershop than was the space in which defendant had parked across Farmington; they regarded defendant's conduct in choosing the more distant space as unusual. They suspected that he was planning a robbery.

After defendant had been standing in front of the grocery store for three to five minutes, the officers saw a man unlock the door to the barbershop. Defendant approached him and the two engaged in a conversation that appeared to the officers as "normal" and that lasted for perhaps 30 seconds. Defendant walked away, and the man entered the shop.

Defendant then returned to his former spot in front of the grocery store. Still suspicious, Gruber—using binoculars—read the barbershop's telephone number, which was displayed on the door. He called the shop on a cell phone and tried to engage the barber in conversation, but was unable to do so due to the barber's lack of facility in English. As Gruber was trying to communicate, he saw defendant walk back to the barbershop, open the door, and enter. The officer could hear a brief conversation at an "elevated" volume before the barber hung up.[1] He then saw defendant walk out of the shop

---

[1] According to the barber's testimony at trial, defendant asked him if he was Tony (the barbershop was "Tony's"), the barber said that he was not, and defendant demanded to know why the barber was lying.

and cross Farmington, apparently returning to his car. Before he got there, however, the Washington County Deputy Sheriff whom Opitz had contacted arrived at the scene and, based on the information provided by Opitz, stopped defendant and asked him for identification.

Defendant produced an Oregon ID card. A warrant check disclosed that defendant's driver's license had been revoked. His car was towed and, pursuant to an inventory policy, searched. Officers found methamphetamine, baggies, a scale, and cash. Defendant was subsequently arrested and charged with possessing and distributing a controlled substance.

At a pretrial hearing, defendant submitted a motion to suppress the drugs and other evidence on the ground that, when the deputy sheriff stopped him, the deputy sheriff did not have reasonable suspicion to believe that he had committed or was about to commit a crime. The court heard testimony recounting the events described above and denied defendant's motion. The court ruled:

> "[I]'m going to deny the Motion to Suppress and the reasoning is as follows: [Defendant] wasn't stopped because of his looks. He does look hardened. * * * But if they would have stopped him because of his looks, they would have stopped him the first time they saw him, which they didn't. They stopped him because of the conduct that they described, and I do accept as credible the officers' testimony as to what they observed.

> "The definition of 'is about to commit' [in ORS 131.605(4)] is interesting. It's defined as unusual conduct that causes an officer to believe that criminal activity may be afoot. Here the officers did [see] sufficient unusual activity to cause them to believe that a robbery or some type of theft was afoot. They probably had, I think they did have, if they would have analyzed it in terms of an attempted robbery, a substantial step towards an attempted robbery at the barbershop, especially for going back the second time. And [defendant] was just sort of looking at escape routes, looking for places of opportunity and there was—the officers had reason to believe that that activity was still afoot when he was heading back to his car."

Defendant was subsequently convicted on stipulated facts. On appeal, he renews the contention that he was unlawfully stopped.

A peace officer may stop a person if the officer reasonably suspects that the person "has committed or is about to commit a crime." ORS 131.615(1). " 'Is about to commit' means unusual conduct that leads a peace officer reasonably to conclude in light of the officer's training and experience that criminal activity may be afoot." ORS 131.605(4). A reasonable suspicion is one that "is reasonable under the totality of the circumstances." ORS 131.605(5). The relevant circumstances, however, must be "specific and articulable facts" that give rise to the inference of criminal activity. *Ehly*, 317 Or at 80. An officer's "special intuitions" "cannot * * * form the entire basis for 'reasonable suspicion,' " and intuitions include such things as suspecting criminal activity based on the observation that a person " 'looked real sharp * * * like a typical pusher, to me,' " or based on such traits as "shined shoes, sharp clothes, [and] neat 'Afro' haircuts." *State v. Valdez*, 277 Or 621, 628-29, 561 P2d 1006 (1977). The fact that there might be innocent explanations for conduct does not mean that the conduct cannot also "give rise to reasonable suspicion of criminality." *State v. Crites*, 151 Or App 313, 316, 948 P2d 757 (1997), *rev den*, 327 Or 82 (1998).

In the present case, no witness testified to a belief that defendant "ha[d] committed" a crime. Rather, the three officers—Gruber, Opitz, and Thompson (the Washington County Deputy Sheriff)—all testified that they believed that defendant was "about to commit a crime," and that is the finding on which the trial court based its denial of defendant's motion: The court found that defendant had taken "a substantial step towards an attempted robbery" and "was just sort of looking at escape routes, looking for places of opportunity and * * * the officers had reason to believe that that activity was still afoot when he was heading back to his car." The court also found as fact that defendant was not stopped because of his appearance. Thus, the question before us is whether the officers' inference, based on defendant's conduct, that defendant was undertaking preparation to commit a crime in the immediate future, was reasonable. We conclude that it was not.

The conduct that formed the basis of the stop was as follows: At midmorning on a Friday in late December, defendant drove slowly through a retail mall parking lot, apparently looking for something or someone. He then parked in a space located across a moderately busy street, instead of in a space that was somewhat closer to what turned out to be his first destination in the mall, a barbershop. He went to that barbershop (adjusting his hat along the way) and tried the door; when he found that it was locked, he walked a short distance away and made a cell phone call. When a man opened the shop, defendant approached him and had a brief conversation, then walked away again. After a pause, he returned to the shop, walked in, had another brief conversation during which voices were raised, and then walked out. At that point, he crossed the street in order to return to his car.

In light of the state's burden of establishing the reasonableness of the stop, the facts that were *not* adduced are also significant. There was no evidence of firearms or other weapons. There was no evidence of recent criminal activity in the vicinity. *Cf. State v. Codr*, 99 Or App 417, 782 P2d 442 (1989) (suspicious activity in the vicinity of recent car prowls implies criminal activity). The officers did not see defendant carrying what might have been stolen property. *Cf. Crites*, 151 Or App 313 (suspect's truck carrying wood of same type reported stolen). There was no evidence that, when defendant left the store, he was leaving a crime scene. *Cf. State v. Schedler*, 47 Or App 181, 614 P2d 591, *rev den*, 290 Or 149 (1980) (sound of breaking glass implies fleeing suspect committed crime). Nobody raised an alarm, including the barber. Indeed, the only evidence that even suggests criminal activity is Gruber's testimony:

"Q [by prosecutor]: And you said that [defendant's decision to park across the street from the barber shop instead of at a closer space] aroused your suspicions, why?

"A [by Officer Gruber]: Well, it just seemed that if he was going to go into that lot, he passed up multiple parking spots where he could have parked and gone to any number of shops there, and then to park across the street at a market and then walk across to another store, another shop, it just didn't make sense. It was out of character for what would be normal.

"Q:   And have you seen that type of behavior before?

"A:   I have. Not specifically observed somebody do that behavior in this kind of setting, but as a canine handler I've done multiple dog tracks of—after armed robberies and burglaries and so forth, and almost always the perpetrator will park away from the crime scene and flee to wherever they parked their car.

"Q:   So will they walk to their—in your experience, is it your experience that they flee on foot to their car?

"A:   Yes. They'll park somewhere nearby where they have access to their vehicle and then walk to the crime scene.

"Q:   Why is your training as a canine handler significant in that regard?

"A:   Because many times tracking from the scene of a crime to try and locate a suspect, it leads to areas such as cul-de-sacs, neighborhoods, and it stops in an area where a car could easily have been parked and the track ends there. Through interviews over the years of people talking about where they went after the crime, you know, after they've been caught, they've said that they parked their car away from there and they went to their car.

"Q:   In your experience in other cases, why do people park away from the place where they're about to commit a crime?

"A:   So their vehicle isn't observed leaving, license plates aren't taken."

Even assuming that this testimony could be characterized as "training and experience," it is not persuasive in the present case. The officer's experience (no training is cited) involves different circumstances. Specifically, his experience involved "flight," which did not occur here. His experience occurred in situations where a suspect committed a crime and then, to avoid being seen by witnesses, fled to "cul-de-sacs, neighborhoods." Here, both the suspected crime and the parked car were in busy commercial neighborhoods. Further, the car to which defendant *walked* was located across a busy street from the alleged planned crime; while it is plausible to believe that some criminals will park at a distance from the

crime so that they can flee to the car and escape identification, that scenario is a far cry from a situation in which a criminal would rob a store in one shopping center, then risk having to wait for a break in traffic in order to reach a car parked in another commercial area.

Even if we were to conclude that Gruber's experience corresponded to the facts in this case, however, that conclusion would still not support the stop. It might have supported stopping defendant before or during his last encounter with the barber; within that time frame, an officer with Gruber's and Opitz's experience might reasonably have inferred that defendant was "about to commit" a crime. But defendant was stopped *after* leaving the barbershop, while *walking* away from it. As noted above, the state did not adduce evidence that the officers believed that defendant already had committed a crime, the trial court did not so find, and that is not the state's theory on appeal. The stop stands or falls on the theory that the officers reasonably believed that defendant was going to commit a crime in the near future and had not yet done so, that is, that he was "about to commit" a crime. ORS 131.615(1). To the extent that there ever was evidence supporting that theory, it dissipated when defendant left the barbershop. Thus, the stop was unlawful, and the court erred in denying defendant's motion to suppress.

Reversed and remanded.