Argued and submitted March 31, reversed and remanded September 2, 2009

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# DESIREE SUSIE MARTINEZ,
aka Desiree Susie Wright,
*Defendant-Appellant.*

Marion County Circuit Court
07C40004; A135885

216 P3d 347

Erik Blumenthal, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Christina M. Hutchins, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Rolf C. Moan, Acting Solicitor General.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Carson, Senior Judge.

BREWER, C. J.

## BREWER, C. J.

Defendant appeals from a judgment of conviction for unlawful possession of methamphetamine, ORS 475.894, contending that she was unlawfully seized when a police officer, in the process of arresting her companion, prevented her from leaving the bedroom where she and her companion were found. Defendant argues that her later admission that she had consumed methamphetamine was the product of an exploitation of that unlawful seizure. Or Const, Art I, § 9. We reverse and remand.

Officers Young and Johnson accompanied Deputy Frost, a parole and probation officer, to an apartment where Young had learned that a "wanted person," Chacon, was staying. Frost knocked on the door and a woman, Mercado, who was under the supervision of Marion County Corrections, answered. Mercado consented to a search of the premises. Mercado also told Young that there were other people in the apartment. When Young found a locked bedroom door, he asked Mercado who was inside the bedroom; she answered that Chacon was inside. Johnson, who had been standing outside to prevent anyone from escaping the apartment, told Young that the people inside the room were moving toward the door; as the door opened, Young immediately recognized Chacon and also saw defendant, who was behind Chacon inside the bedroom.

Immediately after the door opened, Young began handcuffing Chacon. As noted, Young was standing in the doorway to the bedroom with Chacon directly in front of him, and defendant stood behind Chacon. Young testified that defendant would have had to physically push past him to leave the bedroom. Just as Young began handcuffing Chacon, defendant asked Young if she could use the bathroom because she had to throw up. Young told her to "wait a moment" and asked her if she had "any drugs or narcotics or any contraband on her person." Young asked that question

"based on the fact that once the door was just opened, and it had been previously locked, and then she immediately said she had to throw up. I formed the opinion that there's the possibility she may have just ingested narcotics.

"* * * * *

"Or was trying to conceal narcotics to dispose of in the restroom."

Defendant consented to a search of her person, conducted by Frost, which turned up nothing. Frost then escorted defendant to the bathroom and stood in the open doorway as defendant vomited. Young eventually traded places with Frost and stood in the doorway of the bathroom until defendant had finished vomiting. While defendant was in the bathroom, Chacon consented to a search of the bedroom, which revealed a methamphetamine pipe.

After defendant finished vomiting, she stepped out of the bathroom and into the common area of the apartment where Johnson and Mercado were standing. Johnson asked defendant if the reason that she and Chacon had failed to immediately open the bedroom door was because they were smoking methamphetamine. Defendant answered that they had been using methamphetamine, that she had smoked it from a glass pipe that Chacon had furnished, and that the methamphetamine had made her feel sick and caused her to vomit.[1] At that point, defendant was not under arrest and was not handcuffed, but Johnson testified that he was unsure whether defendant would be arrested. According to Johnson, it was up to Young to decide whether to arrest defendant. Johnson also testified that, if defendant had attempted to leave, he would have asked Young whether he should stop defendant from leaving because "that was going to be a decision that Officer Young was going to make at that point."

Defendant argued before the trial court that

"[defendant] was seized almost immediately. In the legal sense she was stopped, she was seized, and the police didn't have any reason for it. She wanted to go to the bathroom, they say no, wait. They're blocking the door * * *.

"But the effect is she's seized once she asked to use the bathroom and they tell her no. They then search her, they exploit the seizure to get her consent to search, they don't find anything. They don't even need to search her, because

---

[1] Johnson could not recall whether Young had told him about the methamphetamine pipe found in the bedroom before he questioned defendant.

they then not only have seized her at that point, they continue with her seized, in custody, when they follow her or take and certainly watch her vomit. They're standing in the doorway; they're watching her."

Accordingly, defendant argued, the statement that she made to Johnson was the unattenuated product of the unlawful seizure of her person that began when she was denied permission to leave the bedroom and go to the bathroom. Defendant also argued that the officers were required to give her *Miranda* warnings because she was in custody when Johnson questioned her.

The prosecutor countered that it was "almost absurd" to suggest that defendant was "in custody" when she was in the bathroom and that "[s]he could have walked outside and puked in the street if she wanted to." The trial court then denied defendant's motion to suppress her statement, reasoning:

"It's a close one. It's a tough one. I have some troubles with the casual way the officers approached this case.

"On the other hand, * * * the truth at the end of the day is [defendant] apparently volunteered this information with virtually—I know what you're saying, you think it's a custodial situation, but she's clearly not under arrest at the time she makes this statement to the officer. I don't think she was seized. I disagree with that.

"And I don't really know whether she was free to go or not; the officer really didn't answer that. For example, she walked out of the bathroom and[decided not] to talk to Officer Johnson and just said I'm leaving, there's no evidence in fact they wouldn't have let her go. He was saying even after she made the admission about the meth, he still wasn't sure they would let her go or not, until he conferred with Officer Young.

"I'm bothered by the officers' casual approach to this, but I don't think any constitutional rights were violated. The motion to suppress is denied."

Defendant was convicted after a trial on stipulated facts; this appeal followed.

■ Defendant renews her arguments on appeal, contending that she was seized when Young denied her request to leave the bedroom and, therefore, Johnson's question resulting in her admission constituted an exploitation of the unlawful seizure. The state counters that, even if defendant were seized from the outset, that seizure was reasonable under the circumstances and ended once defendant was released from the bedroom. In the state's view, defendant was free to leave once Young let her out of the bedroom and, thus, her admission to Johnson that she had used methamphetamine was sufficiently attenuated from the initial seizure that it was not the product of an exploitation of that seizure. We agree with defendant.

We have previously concluded that a police encounter under similar circumstances constituted a seizure under Article I, section 9, of the Oregon Constitution. In *State v. Rocha-Ramos*, 161 Or App 306, 311-12, 985 P2d 217 (1999), we held that the defendant had been stopped when, after officers entered an apartment where he was staying, the defendant immediately stood up and asked to go to the bathroom, and one officer "asked him to wait" and prevented him from leaving the room he was in by interposing herself between the defendant and a hallway leading to the bathroom. That sequence of events, we held, constituted a seizure, because the officers' actions interfered with the defendant's freedom of movement. *Id.* at 312. That reasoning controls here. Defendant was initially seized when she asked to leave the bedroom and Young denied her permission, physically blocked the doorway, and prevented her from leaving. *See State v. Holmes*, 311 Or 400, 409, 813 P2d 28 (1991) (person is "seized" for purposes of Article I, section 9, and therefore stopped, "if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement").

■ We next consider whether the seizure of defendant was lawful. A seizure may be justified by reasonable suspicion of criminal activity. ORS 131.615(1). "Reasonably suspects" is defined by ORS 131.605(5) to mean that "a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place the peace

officer acts as authorized in ORS 131.605 to 131.625." In other words, the officer must subjectively believe that the stopped individual has committed a crime, and that belief must be objectively reasonable. *State v. Belt*, 325 Or 6, 11, 932 P2d 1177 (1997). An officer has reasonable suspicion if he or she "is able to point to specific and articulable facts that give rise to a reasonable inference that a person has committed a crime." *State v. Ehly*, 317 Or 66, 80, 854 P2d 421 (1993). Defendant argues that the officers identified nothing that supported a reasonable suspicion that she had been, or was, engaged in criminal activity. We agree.

Here, Young testified that he asked defendant whether she had any controlled substances on her person, because

> "once the door was just opened, and it had previously been locked, and then she immediately said she had to throw up. I formed the opinion that there's the possibility she may have just ingested narcotics.
>
> "* * * * *
>
> "Or was trying to conceal narcotics to dispose of in the restroom."

Young offered no other rationale for his decision to prevent defendant from leaving the bedroom without first being searched; indeed, Young disclaimed any concern for his safety. We conclude that Young failed to identify any specific and articulable facts that could give rise to an inference that defendant was engaged in criminal activity. Merely failing to immediately open a locked bedroom door and expressing a desire to use the bathroom to vomit does not give rise to a reasonable suspicion that an individual is engaged in narcotics activity. It follows that the seizure of defendant was not supported by a reasonable suspicion that she was engaged in criminal activity and that the officer, therefore, violated her rights under Article I, section 9.

■  The state argues that defendant's statement to Johnson was nonetheless admissible because defendant was no longer seized once Young let her out of the bedroom to use the bathroom to vomit. We disagree. When Young permitted defendant to leave the bedroom, Frost *escorted* defendant and

stood in the open doorway of the bathroom while defendant vomited. Johnson then took Frost's place at the bathroom door. Thus, defendant was constantly under police supervision while she was in the bathroom. Moreover, when defendant had finished vomiting, she left the bathroom and was confronted by Johnson, who asked her whether she had been slow in opening the door to the bedroom because she had been smoking methamphetamine. Defendant made her inculpatory statement in response to that question. We have little difficulty concluding that, during that sequence of events, defendant remained seized under Article I, section 9.

■　　As *Holmes* explains, a defendant is seized when "a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement." 311 Or at 409. Defendant was not free to leave when Young released her from the bedroom because she was immediately placed under the supervision of Frost who stood in the doorway of the bathroom, blocked defendant's exit, and observed defendant vomiting. When defendant left the bathroom, she likewise was not free to leave because she was immediately asked by Johnson about the circumstances of her methamphetamine use. Johnson's testimony that he was unsure whether defendant was free to leave because he would have had to confer with Young only reinforces that conclusion: Defendant was never told that she was free to leave, and Johnson's testimony suggests that she was in fact not free to leave. In short, defendant continued to be seized because the officers continued to significantly restrict her freedom of movement throughout the encounter.

Because defendant's inculpatory statement was made at a time when she was unlawfully seized under Article I, section 9, the trial court erred in denying defendant's motion to suppress her statement.[2]

Reversed and remanded.

---

[2] The state argues that defendant's statement was not obtained by exploiting a prior unlawful stop because the initial seizure of defendant in the bedroom ended when she was released to use the bathroom. However, as explained above, the seizure of defendant was ongoing throughout her encounter with the officers and, thus, we need not determine whether any *prior* unlawful stop was exploited.