Argued and submitted September 30, 2009, reversed and remanded
March 3, 2010

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## SARBAZ M. KHOSHNAW,
aka Sarbaz M. Uhoshnaw,
aka Sarbaz Mohammed Khoshnaw,
*Defendant-Appellant.*

Multnomah County Circuit Court
070733253; A138146

227 P3d 1188

Kenneth A. Kreuscher, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Matthew J. Lysne, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Breithaupt, Judge pro tempore.

BREWER, C. J.

**BREWER, C. J.**

Defendant, who was convicted of one count of being a felon in possession of a firearm, ORS 166.270, and one count of unlawful use of a firearm, ORS 166.250, argues on appeal that the trial court erred in denying his motion to suppress evidence. The trial court's factual findings are binding on appeal as long as there is constitutionally sufficient evidence to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We therefore review the record, and all inferences that it will support, in the light most favorable to the trial court's findings. *Id.* As explained below, this is one of the rare cases in which we conclude that a key finding by the trial court concerning whether a stop had occurred is not supported by evidence in the record. Moreover, we conclude that the trial court's alternative basis for denying the motion to suppress—that any stop was supported by reasonable suspicion—is incorrect as a matter of law. We therefore reverse and remand.

Officer Richardson was parked in his police car in a location off Barbur Boulevard at approximately 1:00 a.m. on July 3, 2007. He was in a position where he could see the entrance of a 7-Eleven store across the street. He saw defendant walk into the parking lot of the 7-Eleven and pause some distance from the door. For approximately 10 seconds, defendant appeared to be reaching into the front of his pants, but Richardson could not see what defendant was doing. When Richardson could see defendant's hands again, however, he noted that defendant's hands were empty. Richardson then saw defendant enter the 7-Eleven. Richardson pulled his patrol car closer in order to observe the situation. Defendant emerged several minutes later with soda pop and a bag of chips in his hands and began walking away from the 7-Eleven. Defendant walked approximately one and a half blocks away from the 7-Eleven before Richardson pulled his car across Barbur Boulevard and parked on the shoulder of the road close to where defendant was walking. He did not activate the car's lights or sirens. Defendant saw the patrol car pull up and stopped walking. Richardson left the car and began talking to defendant.

Richardson asked defendant where he was headed and what he was doing out at that time of night. He also asked defendant for his name and birthdate, and defendant provided a name and birthdate.[1] Richardson wrote down defendant's name and birthdate and, while standing "a couple" of feet in front of defendant, used his shoulder radio and called in defendant's personal information, asking the dispatcher to check defendant for "wants." Richardson did not use the term "warrants" when he called in defendant's information. Defendant did not ask Richardson any questions about what Richardson was doing.

Richardson then asked defendant if he could check him for weapons, and defendant replied, "If you want to." Richardson frisked defendant and discovered a concealed pistol, which led to the charges at issue in the present case.

At the suppression hearing, Richardson testified about his reasons for approaching defendant. Richardson was aware that the 7-Eleven store had only one clerk working at the time he saw defendant approach the store and noted that there were no cars in the parking lot and no other customers in the store. There also was no vehicular or pedestrian traffic on Barbur Boulevard at that time. He became suspicious when defendant paused some distance from the door of the 7-Eleven and did something with the front of his pants for approximately 10 seconds. He knew from experience that sometimes robbers will stop in a parking lot to don masks or gloves before approaching a robbery target. He also had apprehended a suspect at the same store in the past, who had a ski mask and gloves concealed in the front of his pants and who had parked around the corner from the store, gone into the store, and returned to the car after having bought a scratch-off ticket. Richardson testified that, in his experience, robbers of convenience stores may go into the store and make minor purchases in advance of a robbery in order to determine how much money is in the register. For all of those reasons, Richardson suspected that defendant might have been intending to rob the 7-Eleven. Richardson also testified

---

[1] The name that defendant gave was later discovered to be false but not until after the events at issue here occurred.

that, had defendant attempted to leave during their conversation, Richardson would have detained him. Richardson did not, however, tell defendant that he was not free to leave at any point before he discovered the pistol.

Defendant testified at the suppression hearing that he did not feel free to leave during his conversation with Richardson.

Defendant argued at the suppression hearing that he was stopped without reasonable suspicion when Richardson approached him, requested and wrote down his name and birthdate, and called in that information to dispatch. The state responded that Richardson had reasonable suspicion to stop defendant and that, alternatively, no stop had occurred before defendant consented to the frisk that revealed the weapon.

The trial court made factual findings consistent with the facts recited above, and also made the following finding:

> "I find that it is more likely than not on the record before me that [defendant] was not aware that Officer Richardson had called in the fake name and requested information about him in his request for wants. I say that because [defendant] never mentioned it at all. In fact, in [defendant's] testimony, his only testimony about his name being checked was when the officer ran it on the computer in the car [after defendant had given his true name], which makes me think, as I said, it's more probable than not that he was not even aware that the officer was running his name."

The court then went on to describe the Oregon Supreme Court's holding in *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), opining that the court had held "gratuitously, and in my view without any explanation or support" that "anybody who knows a police officer is running their name wouldn't feel free to go." The court went on to state, however, that "because I have made the factual finding that the defendant was not aware that his name was being run, I conclude that the *Hall* and *Rider* cases do not apply[.]"[2]

---

[2] *State v. Rider*, 216 Or App 308, 172 P3d 274 (2007), *rev dismissed*, 345 Or 595 (2008).

The court then held, in the alternative, that if there was a stop, it was supported by reasonable suspicion:

"[G]iven a totality of circumstances, any one of which individually might not go anywhere, but collectively and with this one act in particular of the movements in the waistband giving rise to reasonable suspicion. Again, this is the hour of day, approximately 1:00 in the morning; parking lot having no other cars; there being no other traffic nearby; there being no other customers in the store; the clerk is working alone; the location that the defendant stopped on his way in; which as I said, close enough to see in, not close enough to be caught probably by any security cameras; of most significance, the movement of his hands in front of his pants in the waistband area, not consistent with other usual motions to tuck in shirts, hitch up pants, reach into pockets to get money or wallets, and then coming out with a small purchase consistent with somebody checking out the status of the cash register."

Accordingly, the trial court denied defendant's motion to suppress. Defendant was convicted, and this appeal ensued.

■      On appeal, defendant challenges the trial court's initial conclusion that he was not stopped, as well as its alternative conclusion, that if he was stopped, reasonable suspicion supported the stop. As explained below, we agree with defendant that the trial court erred in both respects.

■      We first turn to the issue of the stop. Defendant observes, correctly, that "[t]he burden to establish the lawfulness of a warrantless search and seizure is on the state." *State v. Sargent*, 323 Or 455, 461, 918 P2d 819 (1996). Therefore, it was the state's burden to present evidence to establish that defendant was not stopped when Richardson found defendant's pistol. A "stop" requiring reasonable suspicion occurs "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances." *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991). As we said in *State v. Parker*, 225 Or App 610, 614-15, 202 P3d 205, *adh'd to as modified on recons*, 227 Or App 413, 206 P3d 259 (2009),

"[A]s the party bearing the burden of demonstrating the lawfulness of the search, the state can prevail against a *Holmes* type (b)-based motion to suppress if it disproves *either* of those conjunctive components. That is, the state can prevail either (1) by proving that the defendant did not believe that the officer had significantly restrained or interfered with the defendant's freedom of movement or (2) if such a belief would not be objectively reasonable."

(Emphasis in original.)

In the present case, the state acknowledged before the trial court that, under Oregon case law, Richardson's writing down of the identifying information that defendant gave him and then calling it in on his radio for "wants" provides the basis for a belief that Richardson had significantly restrained defendant's freedom of movement.[3] *See Hall*, 339 Or at 19 ("[W]e find it difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check[.]"); *State v. Ashbaugh*, 225 Or App 16, 27, 200 P3d 149 (2008), *rev allowed*, 346 Or 257 (2009) ("[W]e have repeatedly held that, when a police officer obtains a person's identification and uses it to check for outstanding warrants or probation violations, the person has been stopped."); *State v. Highley*, 219 Or App 100, 108, 180 P3d 1230 (2008) (holding that a reasonable person whose identifying information has been written down would understand that the officer who immediately returned to his car was doing so in order to run a warrant check); *State v. Rider*, 216 Or App 308, 314, 172 P3d 274 (2007), *rev dismissed*, 345 Or 595 (2008) (concluding that defendant was stopped when officer wrote down identifying information and instructed another officer to run a warrant check).

The state posits, however, that the trial court's ruling was nonetheless correct, because under the "subjective" prong of the *Holmes*-type (b) analysis, "defendant was *not* actually aware of the warrant check," and, therefore, Richardson had not significantly interfered with or otherwise

---

[3] The state argues on appeal that the case law on this point was wrongly decided. We reject that argument without discussion.

deprived defendant of his liberty. In support of that argument, the state points to the trial court's factual finding that "it is more likely than not on the record before me that [defendant] was not aware that Officer Richardson had called in the fake name and requested information about him in his request for wants." The state does not, however, offer any persuasive counter to defendant's argument that that particular factual finding is not supported by constitutionally sufficient evidence in the record.[4]

As explained below, we agree with defendant that the challenged factual finding is not supported by constitutionally sufficient evidence in the record. The state points to nothing in the record that supports the finding, and we can find nothing. The record, viewed in the light most favorable to the state, shows that Richardson was standing a couple of feet in front of defendant, questioning him, when he called in defendant's information to the dispatcher. Defendant testified that he did not feel free to leave. Richardson testified that defendant, in fact, was not free to leave. Nothing in the record indicates that defendant was impaired, distracted, or doing anything other than responding to Richardson's questions when Richardson called in the information.

The trial court's explanation of its finding—that defendant "never mentioned it at all" but did describe something that occurred later in the encounter, after defendant had been arrested—appears to impermissibly shift the burden of proof onto defendant. Defendant testified that he did not feel free to leave during the portion of the encounter before Richardson frisked him and found the gun. He was not asked, either on direct examination or on cross-examination, about Richardson's action in using his shoulder radio to call in the information defendant had originally provided, or how that affected his belief that he was not free to leave. On cross-examination, the prosecutor asked defendant about what

---

[4] The state does emphasize that Richardson used the word "wants" when he called in defendant's information, rather than the word "warrants." However, "warrant" is not a magic word that somehow converts a conversation into a stop. The inquiry is whether a reasonable person would believe he or she was not free to leave because he or she was the subject of a pending investigation. An investigation into whether a person is "wanted" would certainly be understood to whether warrants were outstanding.

had happened after defendant was placed under arrest and given *Miranda* warnings and whether Richardson had asked defendant at that point whether defendant minded if Richardson ran that information.[5] Defendant responded that Richardson had not made such an inquiry, but had merely asked for defendant's name and put it into the computer. In short, defendant was asked about something unrelated to Richardson's action in radioing in the original information that defendant had provided to him. Because defendant did not have the burden of proof—and in any event, there was no reason for defendant to volunteer information unrelated to the questions asked of him—the fact that defendant did not testify about Richardson's use of his shoulder radio earlier in the encounter is not pertinent to the issue presented.

In sum, the record is devoid of evidence to support the trial court's finding that defendant somehow inexplicably failed to hear the officer who was standing directly in front of him call in his information to dispatch. Accordingly, we conclude that the trial court erred in determining that defendant was not stopped under the "subjective" prong of the *Holmes* type (b) analysis.

We turn to the trial court's alternative basis for denying suppression. As noted, the court held that, if defendant had been stopped, reasonable suspicion justified the stop. ORS 131.615(1) provides that "[a] peace officer who reasonably suspects that a person has committed or is about to commit a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry." ORS 131.605(4) defines "is or is about to commit" as *"unusual conduct* that leads a peace officer reasonably to conclude in light of the officer's training and experience that criminal activity may be afoot." (Emphasis added.)

As noted, the officer gave numerous reasons why his suspicions were aroused: the late hour; the lack of vehicular or pedestrian traffic; no customers in the store; only one clerk

---

[5] Richardson had testified that, after defendant had been arrested—and had admitted giving a false name earlier—but before they went into the police station, "I had asked him if running his name while we were talking was okay. He said, 'Yeah.'"

working in the store; defendant pausing to do something with the front of his pants for approximately ten seconds before entering the store; defendant leaving the store carrying pop and a bag of chips.

The late hour, the lack of traffic, the lack of customers, and the presence of a single clerk, however, do not come within the ambit of "unusual conduct" under ORS 131.605(4). Rather, the record supports an inference that all of those circumstances were, in fact, the usual circumstances of the location at the time. We fully understand that those circumstances were such that it was reasonable for an officer to keep an eye out for crime in the area. None of those circumstances, however, had anything to do with "unusual conduct" by defendant that would cause a police officer reasonably to conclude that criminal activity was afoot.

██ Furthermore, defendant's leaving the 7-Eleven with pop in one hand and a bag of chips in the other hand, while at least "conduct" on defendant's part, can scarcely be described as "unusual." The state asserts that "[t]he possibility that there may be a non-criminal explanation for the facts observed * * * does not defeat the reasonableness of the suspicion." *State v. Kolendar*, 100 Or App 319, 323, 786 P2d 199, *rev den*, 309 Or 698 (1990). In *Kolendar*, the defendant was observed driving and discovered to have alcohol on his breath. The defendant argued that those facts did not give rise to reasonable suspicion of driving under the influence of intoxicants because the odor of alcohol did not indicate whether the defendant was, in fact, impaired. We held that "[t]he odor of alcohol on a person's breath is an objective, observable fact that permits an officer reasonably to suspect intoxication." *Id.* at 323. By contrast, here, it would be illogical to infer that the possession of pop and chips by a person leaving a convenience store is an objective, observable fact that permits an officer reasonably to suspect robbery. In fact, Richardson acknowledged in his testimony that the purchase of pop and chips at a convenience store at that hour was "not unusual." The fact that robbers sometimes make purchases at convenience stores before robbing them in order to see how much money is in the till simply does not make purchasing items at a convenience store "unusual conduct" so as to give

rise to reasonable suspicion that a robbery is about to be committed.

Thus, the only "unusual conduct" by defendant was his pausing before entering the 7-Eleven and doing something with the front of his pants for approximately 10 seconds before entering the store. We quote Richardson's testimony concerning that conduct:

"[H]e stopped shy of the doors. So he hasn't got actually up to the sidewalk part. He's still in the parking lot.

"Then from my vantage point, I'm pretty much behind him. I see him with both hands reach towards like the waistband area of the front of him. For I'd say like about ten seconds or so, I see him messing around with the front part of his waistband.

"* * * * *

"* * * [Y]ou don't really see too many people who will just stop shy, still in the parking lot and then start messing around with an area where, you know, from my training and experience people will put guns there or, you know, something else, like a mask or maybe—even had gloves recovered from that area.

"* * * * *

"I'm actually—I'm waiting for him to either pull out a weapon or pull out a ski mask and put that on before he goes into the store, so sort of a getting ready to go in and rob the place, but far enough back from the store that he is not going to be picked up, you know, by cameras or maybe somebody else that's inside.

"* * * * *

"So after about the—about ten seconds of doing that, he then comes out with nothing in his hands and then goes into the store. At this point, I'm still under the impression that something is going to go down because that just wasn't normal behavior."

As noted, several minutes after that, defendant left the store with pop and chips and walked approximately one and a half blocks before Richardson stopped him. Richardson described nothing about the manner in which defendant left the store or walked away as suspicious in any respect.

We agree that fiddling around with the front of one's pants for 10 seconds while standing a short distance away from the entrance of a convenience store is somewhat "unusual conduct." Moreover, we assume that, in light of Richardson's testimony concerning his training and experience in such matters, such conduct appeared to be consistent with preparation to withdraw a weapon, mask, or gloves from the pants in order to commit a robbery. The question, however, is whether that unusual conduct—which was *not*, in fact, followed by defendant pulling a weapon, mask, or gloves from his pants but was followed by defendant entering a convenience store empty-handed and coming out a few minutes later with pop and chips in his hands—justified stopping him after he had walked a block and a half away from the convenience store.

We reject at the outset the state's argument, made in the first instance on appeal, that Richardson had reasonable suspicion after defendant left the 7-Eleven that defendant "ha[d] committed" the crime of robbing the 7-Eleven. ORS 131.615. Richardson testified about his suspicions that defendant was making preparations to commit the crime of robbery at the 7-Eleven, but he never indicated (and the record does not support the inference) that he believed that defendant had robbed the 7-Eleven before he walked out of the store carrying pop and chips.

The question thus reduces to whether Richardson reasonably believed, when he stopped defendant one and a half blocks away from the location where defendant had purchased pop and chips, that defendant was "about to commit a crime." ORS 131.615(1). As explained below, we conclude that whatever suspicions Richardson might have had when defendant was fiddling with the front of his pants in the parking lot of the convenience store, they were not sufficient to justify a stop at the time Richardson stopped him.

Defendant argues, and we agree, that this case resembles *State v. Villemeyer*, 227 Or App 193, 205 P3d 49 (2009), in several key respects. In *Villemeyer*, police officers observed a man they believed looked "hardened" circle his car slowly through shopping center parking lots, choose a parking space, then cross a road to a barber shop and try the door

to that shop, which was locked. The man—the defendant—then walked a short distance to the front of a grocery store and made a call on his cell phone. Several minutes later, the barber unlocked the door to the barbershop, and the defendant approached and spoke with him for approximately 30 seconds, then walked away and returned to the front of the nearby grocery store. *Id.* at 195-96. One of the officers contacted the barber shop by telephone and, while that call was in progress, the defendant briefly returned to the barber shop, engaged in a conversation in which voices were raised, then crossed the street to return to his car. Before he reached his car, however, he was stopped by the police. *Id.* at 196-97.

In *Villemeyer*, an officer testified that the defendant's behavior in parking across the street and crossing to the barber shop, was unusual. He testified that, in his experience, robbers will "park somewhere nearby where they have access to their vehicle and then walk to the crime scene," so that witnesses can't get their license plate numbers. *Id.* at 200. We stated:

> "[Reasonable suspicion] might have supported stopping defendant before or during his last encounter with the barber; within that time frame, an officer * * * might reasonably have inferred that defendant was 'about to commit' a crime. But defendant was stopped *after* leaving the barbershop, while *walking* away from it. As noted above, the state did not adduce evidence that the officers believed that defendant had already committed a crime, the trial court did not so find, and that is not the state's theory on appeal. The stop stands or falls on the theory that the officers reasonably believed that defendant was going to commit a crime in the near future and had not yet done so, that is, that he was 'about to commit' a crime. ORS 131.615(1). To the extent that there ever was evidence supporting that theory, it dissipated when defendant left the barbershop."

*Id.* at 201 (emphasis in original).

■ This case is similar. To the extent that there might have been reasonable suspicion that defendant was "about to commit" a robbery when defendant fiddled with his pants in front of the 7-Eleven, any such reasonable suspicion dissipated when defendant finished whatever he was doing,

entered the store empty-handed and left the store after having made a purchase of several items that are "not unusual" to acquire from a convenience store.[6] Moreover, once defendant walked one and a half blocks away from the store without doing anything that could even remotely be described as suspicious, Richardson had no reasonable suspicion that defendant intended to soon return to rob the store. Accordingly, we conclude that reasonable suspicion did not support Richardson's stop of defendant.

The trial court erred in denying defendant's motion to suppress.

Reversed and remanded.

---

[6] In this case, unlike in *Villemeyer*, the state *does* argue that there was reasonable suspicion that a crime had been committed. However, as noted above, Richardson's testimony does not support a conclusion that he had any such belief. Moreover, the trial court's conclusion that reasonable suspicion justified the stop referred to defendant fiddling with his pants and then coming out of the store with a small purchase as "consistent with somebody checking out the status of the cash register." The court did not suggest in any way that it thought that Richardson had reasonable suspicion to believe that a crime had been committed.