Submitted September 30, 2009, affirmed September 22, 2010

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**BUCK WADE DAVIS,**
*Defendant-Appellant.*

Jackson County Circuit Court
074242MI; A137633

239 P3d 1002

Peter Gartlan, Chief Defender, Travis Eiva, Deputy Public Defender, and Kenneth Kreuscher, Deputy Public Defender, Appellate Division, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Doug M. Petrina, Senior Assistant Attorney General, filed the brief for respondent.

Before Brewer, Chief Judge, and Landau, Haselton, Armstrong, Wollheim, Schuman, Ortega, Rosenblum, Sercombe, Judges, and Breithaupt, Judge pro tempore.

WOLLHEIM, J.

Sercombe, J., concurring.

Schuman, J., concurring in part and dissenting in part.

## WOLLHEIM, J.

Defendant appeals a judgment of conviction for driving while suspended (DWS), ORS 811.182.[1] He was arrested after a Jackson County Sheriff's deputy randomly accessed defendant's driving records after defendant drove by the deputy. Defendant's driving records revealed that his license had been suspended. The deputy stopped defendant solely because his license had been suspended. Defendant assigns error to the trial court's denial of his motion to suppress all evidence that the deputy discovered during his random investigation. Defendant argues that the deputy's investigation constituted an unreasonable search in violation of Article I, section 9, of the Oregon Constitution and that the deputy's investigation imposed an unequal and standardless burden on defendant in contravention of Article I, section 20, of the Oregon Constitution. We review the trial court's legal conclusions under Article I, sections 9 and 20, for errors of law, *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993), and affirm.

■  On review for errors of law, "[a] trial court's findings of historical fact are binding on appellate courts if there is constitutionally sufficient evidence in the record to support those findings." *Id.* We state the facts according to that standard. Two on-duty Jackson County Sheriff's deputies were driving in a patrol car. Jackson County Sheriff's deputies regularly run registration plates of vehicles that they encounter. They do that for two reasons. First, they do so during traffic stops to identify the stopped individuals, to determine whether the stopped vehicles are stolen, and to assess the validity of the vehicles' registration plates—that is, whether the plates have been switched from other vehicles or are current. Second, they also routinely randomly run registration plates that they observe in public to determine whether vehicles have been stolen or whether the registration plates are valid. Although there was no written policy mandating that the deputies randomly run registration plates on vehicles they encountered, the deputies are trained to run registration plates for the described reasons.

---

[1] ORS 811.182 was amended in 2009. Or Laws 2009, ch 783, § 14. That amendment does not impact this case.

As the two deputies were on patrol, they drove past defendant and observed his vehicle, registration plate, and face. In accordance with his training, the deputy in the passenger seat randomly ran the registration plate on the vehicle that defendant was driving.[2] The deputy's decision was not based on defendant's appearance or a belief that defendant had committed a traffic infraction. Instead, the trial court found that the deputy's decision to run defendant's plate was purely random in the sense that the deputy could have run anyone's license plate. It observed that, consistently with the deputy's practice, "we are all subject to the same possibility, which is having our license plate run at such time as we choose to drive down the street." The deputy's random investigation revealed that the Oregon Department of Transportation, Driver and Motor Vehicles Division (DMV) had suspended the vehicle owner's driving privileges. Then, according to the deputy's routine practice, he accessed a Jackson County booking photo of the vehicle's owner to determine whether the vehicle's owner was the driver whom the deputy had observed. The photo matched the driver's appearance. After concluding that defendant was driving while suspended, the deputies stopped the vehicle, confirmed that defendant was driving while his license was suspended, and then arrested him.

Before trial, defendant moved to suppress all evidence derived from the deputy's random investigation. That evidence, defendant argued, was obtained through an unreasonable search under Article I, section 9, and was also an unlawful exercise of police discretion under Article I, section 20. The trial court denied defendant's motion, and defendant filed a conditional guilty plea to DWS, reserving his right to appeal the court's denial of his motion to suppress evidence. On appeal, defendant renews the arguments that he made in support of his motion to suppress.

We first consider defendant's argument regarding a warrantless search. Article I, section 9, provides, in pertinent part, "No law shall violate the right of the people to be secure

---

[2] The deputy testified that he ran registration plates "randomly." He did not elaborate on what he meant by "randomly," nor was he asked to explain his choice to use that word.

in their persons, houses, papers, and effects, against unreasonable search, or seizure." A police officer conducts an Article I, section 9, search by intruding upon a person's privacy interest. "A privacy interest * * * is an interest in freedom from particular forms of scrutiny." *State v. Campbell*, 306 Or 157, 170, 759 P2d 1040 (1988). If the government conduct did not invade a privacy interest, then no search occurred; Article I, section 9, is not implicated, and the inquiry is concluded. *State v. Meredith*, 337 Or 299, 303, 96 P3d 342 (2004). Whether government conduct intrudes upon a person's cognizable privacy is a question of law. *State v. Johnson*, 340 Or 319, 336, 131 P3d 173, *cert den*, 549 US 1079 (2006). Accordingly, we first consider whether defendant has a protected privacy interest in his driving records.

Defendant identifies two potential privacy interests. First, he argues that, although his registration plate was in plain view as he drove on public streets, his driving records were not. Defendant concludes that he has a privacy interest in his driving records because they are not generally available to the public. Second, defendant argues that ORS 802.177 creates a privacy interest by prohibiting the Department of Transportation (DOT) from disclosing personal information contained in driving records.

Defendant's first argument relies on *Campbell*. In that case, police officers attached a transmitter to the defendant's vehicle and then pervasively and constantly monitored the defendant's movements. 306 Or at 160-61. That use of a transmitter implicated the defendant's privacy interest in moving about free from scrutiny, because "the police monitoring of the transmitter allowed the government to observe a range of conduct that normally would have been inaccessible to the general public or to government officials." *Meredith*, 337 Or at 307 (summarizing *Campbell*). Defendant argues that, as in *Campbell*, "instantaneous and standardless access to the electronic DMV database creates a situation that exposed information about defendant that is otherwise not observable by either an officer or by members of the general public and is, thus, private."

Defendant's reliance on *Campbell* is misplaced. The officer's scrutiny of defendant's driving records is not

comparable to the pervasive and constant surveillance that occurred in *Campbell*. *See* 306 Or at 172. To the contrary, here, the deputy's investigation was neither pervasive nor constant. The deputy's random access to defendant's driving records was prompted by the deputy's contemporaneous observation of defendant, and was limited to the information contained in defendant's DMV driving records.

*Johnson* further undermines defendant's argument. In *Johnson*, the state subpoenaed the defendant's bank, medical, cellular telephone, employment, and other similar records. The defendant objected to evidence that he drove a specific car. The Supreme Court rejected "any claim that [the] defendant might have a cognizable privacy interest in the license plates on his car, photographs taken of him in a public place, the address that he provided to his employer for tax and payroll purposes, or the telephone usage records of his employer." 340 Or at 335-36. It then considered the defendant's argument that he had a privacy interest in his cellular telephone calls. The court recognized that the defendant had a privacy interest in the *content* of the phone calls, but rejected the defendant's assertion that he had a privacy interest in the *records* of those calls. It reasoned, "The cellular telephone provider generated and maintained those records * * * for the provider's own, separate, and legitimate business purposes." *Id.* at 336.

Here, defendant's driver's license and car registration records were created by the state for its own purposes, just as in *Johnson*, where the cellular telephone provider's records were created for the provider's own purposes. The state has a substantial administrative interest in confirming that only licensed persons drive properly registered vehicles on public roads. ORS 803.300 requires vehicles to be registered. ORS 803.540 requires vehicles to display registration plates, in part, as confirmation that the vehicles are registered. ORS 803.550 prohibits obscuring registration plates. The state can access a person's driving records by observing a driver's registration plate that is displayed in plain view and looking up that registration plate number in the state's own records. *See Higgins v. DMV*, 335 Or 481, 487, 72 P3d 628 (2003) ("The characters that the state assigns to a vehicle's registration plates facilitate the prompt identification of the

vehicle for law enforcement purposes."). Indeed, the state has created an electronic system that allows authorized agencies and government entities to access the driving records of individuals and vehicles. *See* ORS 181.730 (establishing the Law Enforcement Data System). Notwithstanding our conclusion that defendant does not have an inherent privacy interest in his driving records, we next consider whether the state granted defendant a privacy interest in his driving records.

Defendant argues that ORS 802.177 creates a privacy interest in the personal information in his driving record by generally prohibiting the DMV, which is a division of the DOT, from disclosing personal information contained in those records. We agree with defendant that ORS 802.177 limits the disclosure of a person's personal information; however, that limitation extends no farther than the statute itself provides. *State v. Makuch/Riesterer*, 340 Or 658, 671, 136 P3d 658 (2006). The limitation does not extend as far as defendant contends, because defendant fails to persuasively explain why the exceptions to ORS 802.179, which are expressly incorporated by ORS 802.177, do not apply to this case.

We construe the statute by considering its text in context along with any legislative history offered by the parties, if helpful.[3] *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). ORS 802.177 generally prohibits the DMV from disclosing personal information contained in driving records to any person. It provides:

> "*Except as otherwise provided in ORS 802.179,* neither the Department of Transportation nor any officer, employee or contractor of the department may knowingly disclose or otherwise make available to any person personal information about an individual that is obtained by the department in connection with a motor vehicle record."

(Emphasis added.) An expressly incorporated exception to ORS 802.177, ORS 802.179(1) provides:

> "The Department of Transportation, upon request or as required by law, shall disclose personal information from a

---

[3] Although the parties offered legislative history, it is not helpful in construing the statute, so we do not discuss it.

motor vehicle record to a government agency for use in carrying out its governmental functions."

Defendant argues that the exemption under ORS 802.179(1) applies only to a government entity's lawful function. Defendant concludes that the DMV "was not authorized to disclose [his] personal information in the course of satisfying the [deputy's] mere whims or curiosity." That argument is not persuasive. The deputy was on duty when he accessed defendant's driving records. One of the Jackson County Sheriff's duties is to arrest "all persons guilty of public offenses," ORS 206.010, and a sheriff is permitted to delegate his duties and authority to deputies, ORS 204.635(3). The deputy accessed defendant's driving records consistently with his governmental function of investigating to detect illegal activity. Because the exemption found in ORS 802.179(1) applies, defendant has no cognizable privacy interest in DMV records concerning him or vehicles registered to him under ORS 802.177, at least as to a law enforcement officer's investigation pursuant to the officer's duties. In conclusion, the deputy did not invade defendant's privacy interest. Therefore, there was no search under Article I, section 9.

We next consider whether the trial court erred in rejecting defendant's contention that the deputy's investigation of his driving records violated Article I, section 20. According to defendant, the deputy's action imposed an unequal burden on him because it "not only undercut defendant's ability to move freely through the public sphere without being subject to substantial scrutiny, but it also led to a criminal prosecution, one of the most severe burdens the government may impose on a citizen."

Article I, section 20, provides that "[n]o law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." It proscribes two types of unequal treatment: "first, to any citizen, and second, to any class of citizens. In other words, it may be invoked by an individual who demands equality of treatment with other individuals as well as by one who demands equal privileges or immunities for a class to which he or she belongs." *State v. Clark*, 291 Or 231, 237, 630 P2d 810 (1981). It "also was early established

that the guarantee reaches forbidden inequality in the administration of laws under delegated authority as well as in legislative enactments * * *." *Id.* at 239.

■■ Thus, "[o]ne branch of Article I, section 20"—the branch that defendant invokes in this case—calls for an "analysis whether the government has made or applied a law so as to grant or deny privileges or immunities to an individual person without legitimate reasons related to that person's individual situation." *Id.* Said another way, the state must not distribute "a benefit or burden in a haphazard, random, standardless, *ad hoc* fashion—that is, 'without any coherent, systematic policy.'" *State v. Walton*, 215 Or App 628, 633-34, 170 P3d 1122 (2007), *rev den*, 344 Or 671 (2008) (quoting *State v. Freeland*, 295 Or 367, 375, 667 P2d 509 (1983)).

■ That said, "[a] complaint of unequal treatment * * * cannot rest simply on the exercise of discretion." Rather, the defendant has the burden of proving that the state administered laws "'haphazardly' by '*ad hoc* decisions' that * * * do not 'uniformly rest on meaningful criteria that indeed make the privileges [or immunities] * * * equally available to all persons similarly situated, or, in the constitutional phrase, 'upon the same terms.'" *Freeland*, 295 Or at 377 (quoting *State v. Edmonson*, 291 Or 251, 254, 630 P2d 822 (1981)).

■ During the hearing on the motion to suppress, the deputy who ran defendant's plates testified regarding his practice of running plates. The deputy testified that it is "an everyday activity" of his,

> "directing traffic stops, running plates—that I run plates routinely to know the individual that I am dealing with, to know whether it is a vehicle that has been stolen, plates have been switched, * * * and it is a good officer safety reason so that if I conduct, or before I conduct a traffic stop in knowing who I am dealing with before I get out of my vehicle."

Later, the deputy explained that he ran defendant's plates without any suspicion of criminal activity, and that he "randomly run[s] plates to make sure that vehicles aren't stolen." That practice is "just normal course," a "normal activity."

On cross-examination, the deputy acknowledged that he was not aware of a "policy that creates standards for how you are going to conduct these random license plate searches," and that he was not aware of a "spoken custom or just informal policy that folks talk about in the Department." However, he testified that he is, in fact, trained to run plates.

Based on the deputy's testimony, defendant and the dissent conclude that the decision to run defendant's plates was essentially made *ad hoc*, unconstrained by any legitimate standards or criteria. The deputy's testimony could be read that way—as though he were making the decision to run the plates without any standard in mind. But that is not the only plausible reading of the deputy's testimony, nor—given our standard of review—is it the one we credit. *See, e.g., State v. Khoshnaw*, 234 Or App 24, 26, 227 P3d 1188 (2010) (where trial court denies a motion to suppress, we "review the record, and all inferences that it will support, in the light most favorable to the trial court's findings").

Though his testimony is not a model of clarity, the deputy explained that he runs license plates "randomly" in the ordinary course of his patrol duties, pursuant to his training. He further testified that, in this particular circumstance, he ran the plates after he saw "the license plate from the front of the truck, and * * * observed the face of the individual driving the truck." He then ran the plate "just to know who owned the vehicle that I am dealing with," to make sure that the vehicle was not stolen. The decision to run the plates, the deputy testified, "had nothing to do with the individual's looks" but was instead simply "a normal activity."

Viewed in the light most consistent with the trial court's ruling,[4] the deputy's testimony suggests that the decision to run the plates was not a haphazard or *ad hoc* decision at all. Instead, it was the result of a confluence of training, time, and opportunity: the deputy was trained to run plates to investigate for stolen vehicles; based on the position of defendant's vehicle, the deputy was able to see defendant's

---

[4] The trial court ruled that "everyone who gets a driver's license subjects themselves to driving down the street and having their license plate looked at and, in this circumstance, run."

front license plate and was able to make out defendant's physical characteristics, which would have allowed him to compare the driver to the registered owner. Under those circumstances, the result was that defendant's license plates were run as part of the deputy's normal activity of investigating for stolen vehicles. In the course of that activity, *any* driver who happened to be coming out of the parking lot at that moment would have been subject to the same scrutiny. There was nothing arbitrary or whimsical about the deputy's decision to run defendant's license plates; rather, that decision was "random"—in the deputy's words—only in the sense that, because of the juxtaposition of time and place, the plates that were run were defendant's, and not some other citizen's. So understood, we cannot conclude that defendant was denied any privilege or immunity on the same terms as other citizens—the benchmark of Article I, section 20. *See Clark*, 291 Or at 246 ("We do not believe equal protection goes so far as to require previously stated standards as long as no discriminatory practice or illegitimate motive is shown and the use of discretion has a defensible explanation.").

Given our view of the record, we need not address some of the more provocative issues raised in the dissent.[5] We simply note that Article I, section 20, has never been applied to require police officers to articulate and adhere to criteria for every discretionary patrol activity that might occur in the ordinary course of a day. To extend *Freeland* in that way— that is, to require officers to justify decisions such as stopping one speeding car as opposed to another—would represent a quantum leap from where our Article I, section 20, jurisprudence has gone before.

Affirmed.

**SERCOMBE, J.,** concurring.

I concur with the majority's conclusion that the *ad hoc* investigation of the license registration of a vehicle

---

[5] There are references in the dissent to discrimination based on class membership. *See* 237 Or App at 367-68 n 1, 371 (Schuman, J., concurring in part, dissenting in part). That kind of discrimination is *not* an issue in this case. Defendant never asserted discrimination based on race, economic status, or gender. For that reason, the lead does not discuss a hypothetical problem that is not raised by the facts in this case.

driven by defendant did not violate Article I, section 9, of the Oregon Constitution. I also agree that the investigation did not deny defendant an official privilege or immunity made available to other citizens of this state as proscribed by Article I, section 20. That provision provides that *"[n]o law shall be passed* granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." (Emphasis added.) This case does not involve a law that classifies privileges in impermissible ways ("granting to any * * * class of citizens privileges[ ] or immunities") or that affects an individual citizen ("granting to any citizen * * * privileges[ ] or immunities") by a delegation of authority to a government agent to offer or restrict an official privilege or immunity that is available to that person. Under our case law, those are the types of laws that are regulated by Article I, section 20. The action of the police officer here was not taken under a law that either directly or indirectly classifies license check inquiries or creates privileges or immunities for persons affected by those inquiries. Thus, Article I, section 20, is immaterial to the outcome of this case.

The guarantee under Article I, section 20, "reaches forbidden inequality in the administration of laws under delegated authority as well as in legislative enactments." *State v. Clark,* 291 Or 231, 239, 630 P2d 810, *cert den,* 454 US 1084 (1981). That delegated authority could be conferred by different types of laws. For example, the legislature could confer authority on an agent to grant or deny benefits or permissions. Such an enactment violates Article I, section 20, when it empowers the agent to confer privileges or immunities that the legislature itself could not confer directly. *See White v. Holman,* 44 Or 180, 74 P 933 (1904) (statute violates Article I, section 20, when it authorized a board to grant an exclusive privilege to operate a sailors' boarding house).

In such a case, the law creates the privilege or immunity (*e.g.,* a license, permit, or legal advantage) and directs the agent to allocate or determine that advantage (*e.g.,* grant or deny the license under particular circumstances). The statutes are replete with laws that create privileges or immunities by directing official action to allow or limit those privileges. For example, professional licensing requirements and

oversight statutes, local government ordinances to allow zoning variances, and state regulations allowing water appropriations are all laws that create a legal privilege by directing actions by a governmental agent to allow, deny, or limit that entitlement. Those types of laws fit squarely within the scope of Article I, section 20, because they directly delegate authority to grant a privilege. Laws involving the specific authority to create a benefit are tested under Article I, section 20, for whether they permit outcomes that violate the constitutional command by, for example, improperly allocating a privilege or immunity or creating a monopoly.

In other cases, a law *separately* creates the benefit, advantage, or right that is administered under more broadly delegated authority from the legislature. The contemporary decisions on citizen rights under Article I, section 20, involve this type of benefit-creating law that is administered by an official under that official's general legal authority. *See City of Salem v. Bruner*, 299 Or 262, 702 P2d 70 (1985) (administration by police officer of statutes creating different appeal rights under local ordinances defining the authority of a police officer); *State v. Freeland*, 295 Or 367, 667 P2d 509 (1983), and *Clark*, 291 Or 231 (administration by district attorney of dual charging system created by statute and constitutional provision under general state statutes defining the authority of a district attorney); *State v. Walton*, 215 Or App 628, 170 P3d 1122 (2007), *rev den*, 344 Or 671 (2008) (administration by prosecutor of statutes creating different sanctions for conduct by probationer under state statutes defining the authority of a district attorney).[1]

In this case, the deputy sheriff exercised authority conferred by statute. *See* ORS 206.010 (setting out general duties of a sheriff, including authority to "[a]rrest * * * all persons guilty of public offenses"); ORS 204.635(3) (delegating authority to deputy sheriff to "perform any act or duty

---

[1] Of course, when a law is challenged as granting privileges to a "class of citizens" under Article I, section 20, the law itself creates a privilege or immunity by classifying groups for purposes of advantaging one group and not another. The advantage created by the classification is the privilege or immunity at stake. The question is whether such a benefit-conferring law is also required when an official action is said to violate Article I, section 20, because the action grants a privilege or immunity to a "citizen."

that the principal has"). Those statutes did not specifically authorize the deputy to establish the purported privilege or immunity at stake in this case. The question becomes whether some other law did.

The resulting Article I, section 20, inquiry, as framed by *Bruner*, is whether "a person is denied some *advantage to which he or she would be entitled* but for a choice made by a governmental authority." 299 Or at 268-69 (emphasis added). An *entitlement* is necessarily legal in character; otherwise, the claim is unenforceable and without legal status. A privilege or immunity, in this entitlement sense, is an advantage that is created or embellished by a constitutional or statutory policy. *Cf. id.* at 268 ("[T]he fact that two processes exist by which one person may enjoy advantages not available to another is precisely what triggers the Article I, section 20, concerns we addressed in *Freeland*.").

Thus, I interpret the *Clark* line of cases to require official consistency when a government official is tasked by law to create or allocate a specific legal right or is authorized by law to administer a privilege or immunity created by a separate law. Where I part company with the dissent is in its assumption that a citizen enjoys a privilege or immunity, in this constitutional sense, to be free of any bad consequence of official action. Under that logic, any arbitrary exercise of official discretion that produces some detriment to a defendant—such as a police officer's decision to pursue one of two speeding cars—violates Article I, section 20.

In my view, the reach of the provision is not that broad. Instead, a privilege or immunity under Article I, section 20, must be "granted" in the sense of achieving that status by legislative or constitutional enactment; it is only official action with respect to that type of privilege or immunity that is constrained by the provision.[2] In this case, there is no law that creates or regulates a privilege or immunity to be free from license plate scrutiny.

---

[2] Our cases also apply Article I, section 20, to classifications of citizens made by a rule or practice of administrative agencies. *See, e.g., Tanner v. OHSU*, 157 Or App 502, 971 P2d 435 (1998) (agency classification with respect to employee benefit policy). This case does not involve that type of "law."

Thus, defendant does not point to any entitlement created by law that is given to others but not him. Indeed, both the majority and the dissent agree that no person has a legal entitlement under Article I, section 9, to be free from official scrutiny in these circumstances. It is difficult to conclude that defendant has a privilege to obtain what others lack.

I concur in the decision for these separate reasons.

Landau, J., joins in this concurrence.

**SCHUMAN, J.,** concurring in part, dissenting in part.

Without any suspicion that defendant was engaging in unlawful activity, a Jackson County sheriff's deputy selected defendant's car at random and entered its license plate number into the patrol car's computer to obtain information from the Department of Motor Vehicles (DMV) database and discovered that the owner of the car had a suspended license. The officer stopped defendant and cited him for that offense. ORS 811.182. Defendant moved to suppress the evidence derived from the database on the ground that, in accessing private information about him without any suspicion of unlawful activity, the officer conducted a search in violation of Article I, section 9, of the Oregon Constitution, and that, in randomly choosing defendant's car as the subject of an inquiry, the officer failed to treat him "on the same terms, * * * equally," with other citizens, in violation of Article I, section 20. The court denied the motion. Defendant renews his constitutional arguments on appeal.

The lead opinion concludes that accessing defendant's personal information was not a search for purposes of Article I, section 9, and that the random selection of defendant's car as the subject of the inquiry did not offend Article I, section 20. I concur with the lead opinion's conclusion regarding Article I, section 9. A person who voluntarily provides DMV with personal information does not suffer any loss of freedom from unwanted scrutiny when a state law enforcement officer observes that information in the course of enforcing traffic laws. *See State v. Campbell*, 306 Or 157, 171, 759 P2d 1040 (1988) (defining "search" as a "practice, if

engaged in wholly at the discretion of the government, will significantly impair 'the people's' freedom from scrutiny"). However, I believe the lead opinion's Article I, section 20, analysis is wrong, and I therefore dissent from that part of the opinion.

A well-established and unambiguous body of Supreme Court precedent establishes the framework for adjudicating the Article I, section 20, issue in this case. Oregon's equality guarantee protects "citizen[s]" as well as "class[es]" of citizens. It provides, "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." Or Const, Art I, § 20. The latter protection has its counterpart in traditional federal Equal Protection Clause jurisprudence: A person claims that he or she is unlawfully denied a privilege or immunity based on the person's membership in some societally recognized class such as race, religion, or gender. The former protection is less familiar: An individual claims that he or she is denied (or that another person is granted) a privilege or immunity, not based on the person's class membership, but based simply on the fact that other individuals who are similarly situated for all relevant purposes are receiving the benefit and the claimant is not (or *vice versa*)—that, in other words, the privilege or immunity is not made available to all individuals "upon the same terms." *State v. Clark*, 291 Or 231, 237, 630 P2d 810, *cert den*, 454 US 1084 (1981).

This court and the Supreme Court have developed a familiar, if not always seamless, approach to class-based Article I, section 20, claims. *See, e.g., Tanner v. OHSU*, 157 Or App 502, 520-23, 971 P2d 435 (1998) (summarizing analysis; calling it a "work in progress"). The court's approach to individual-based claims is less familiar, but it is more consistent and more easily stated. The prohibition against unlawful individual-based distribution of privileges or immunities applies not only against those who enact laws—legislators or the people through the initiative—but to those who administer laws through delegated authority. *Clark*, 291 Or at 239. Unlawful individual-based denial (or

conferral) of a privilege or immunity occurs when government engages in "wholly standardless application of a general law," *id.*, that is, when government distributes privileges or immunities "purely haphazardly or otherwise on terms that have no satisfactory explanation," *State v. Edmonson*, 291 Or 251, 254, 630 P2d 822 (1981). Article I, section 20, restrains "haphazard, purely *ad hoc*, use of discretion." *State v. Freeland*, 295 Or 367, 373, 667 P2d 509 (1983). There must be "consistency among similar cases." *Id.* at 374. Choices must "adhere[ ] to sufficiently consistent standards to represent a coherent, systematic policy." *Id.* at 375. The rule has broad application: "*Whenever* a person is denied some advantage to which he or she would be entitled but for a *choice made by a government authority*, Article I, section 20, requires that the government decision to offer or deny the advantage be made 'by permissible criteria and consistently applied.' " *City of Salem v. Bruner*, 299 Or 262, 268-69, 702 P2d 70 (1985) (emphasis added).

Several considerations limit the apparently dramatic sweep of this requirement limiting government actors' discretion. First, the burden of proving the haphazard, systemless, *ad hoc* application of the law falls on the person challenging the government action—here, of course, defendant. The obvious difficulty of proving a negative probably accounts for the fact that an individual-based Article I, section 20, claim has succeeded in only one case: *Freeland*, 295 Or at 384. Second, the criteria that must be consistently applied need not be written; in fact, they need not be consciously adopted, pre-existing policies. "Even without predetermined rules or guidelines, policies * * * can develop from consistency in practice, and consistency in practice can be both furthered and shown to exist." *Id.* at 378. Thus, the state can successfully defend against an individual-based Article I, section 20, challenge by articulating a rationale underlying the exercise of discretion, and that defense will defeat the challenge unless the challenger can demonstrate that the rationale has not been consistently followed.[1]

---

[1] If the state successfully defeats an individual-based Article I, section 20, claim by demonstrating that the state actor applied the law systematically, then, of course, that system must itself pass muster under a traditional, class-based analysis. Thus, for example, if a person contends that police officers stopped him on

According to defendant, this case presents a rare but clear violation of Article I, section 20, that is not based on class membership. The arresting officer testified that his decision to enter defendant's license plate number into the DMV database was "random," by which he meant that, in deciding to run defendant's license plate, he was not guided by any suspicion of unlawful conduct nor by any formal or informal policies:

"Q [by defense counsel]: [Deputy] Bartlett, was Mr. Davis breaking the law when you ran his license plate?

"A [by Deputy Bartlett]: At the time I ran his plate, no.

"Q: No. So just to be clear, at the time you ran his plate you didn't have probable cause to believe that he had committed any traffic infraction?

"A: At the time (inaudible), no.

"Q: Okay. And did you have any suspicion to believe that he was engaged in any other criminal activity at that time?

"A: No, Ma'am.

"Q: Okay. So you just saw him driving and you thought you would run his license plate?

"A: Yes, Ma'am.

"Q: It was just a random occurrence?

"A: (No response heard.)

"Q: Yes? Okay. And you cited it as common practice that you run license plates. Do you do this without being in an investigation, or having any reason to believe that there is any criminal activity?

"A: Yes, Ma'am.

---

a purely *ad hoc* basis, and the state demonstrates that, in fact, the officer stopped the person because the person was speeding, the state will prevail because imposing the burden on the class of persons who are suspected of speeding does not offend Article I, section 20. On the other hand, if the state defeats the accusation of *ad hoc* administration of the traffic laws by demonstrating that the officer had a policy or practice of stopping Hispanics, that policy would itself be unlawful under the more traditional, class-based Article I, section 20, analysis. *Clark*, 291 Or at 239-40 ("[W]hen wholly standardless application of a general law to individual cases is avoided by formal or informal criteria, these criteria in turn must pass muster under 'classification' analysis.").

"Q: You do that just as a practice, and the Police Department does it as a practice?

"A: I randomly run plates (inaudible).

"* * * * *

"Q: Okay. Does Medford Police—I'm sorry, Jackson County Sheriff's Department—do you have a policy that creates standards or criteria for how you are going to conduct these random license plate searches?

"A: Not that I know, Ma'am.

"Q: There is no written policy? I have actually read the Policy & Procedures Manual, there is nothing in there. Correct?

"A: Not that I know of.

"Q: No. There is no like spoken custom or just informal policy that folks talk about in the Department?

"A: Not that I know of."

Thus, defendant argues, the deputy engaged in conduct that "placed a distinct and real burden on defendant's ability to be left alone and to anonymously go about his daily affairs [and] also led to a criminal prosecution, one of the most severe burdens the government may impose on a citizen"—and he did so on an *ad hoc*, haphazard basis without any criteria at all, much less permissible criteria consistently applied.

The state responds with two arguments. First, it argues that no issue arises under Article I, section 20, because the burden that Bartlett imposed on defendant does not rise to constitutional significance. In particular, the state focuses (as does defendant) on the invasion of defendant's privacy, that is, on the impairment of his freedom from scrutiny and of his freedom to be left alone. I agree; as indicated above, I conclude that defendant *had* no freedom from scrutiny of the personal information that he voluntarily provided to DMV when the scrutiny is by a law enforcement officer in the line of duty. On the other hand, I agree with defendant that, when Bartlett ran his license plate, the deputy was initiating a law-enforcement investigation, and that such an act imposes a constitutionally significant burden on the person being investigated. In *Clark*, 291 Or at 241, the Supreme

Court held that the burden of being charged by grand jury indictment as opposed to by information was of constitutional significance. In *Bruner*, 299 Or at 264-65, 269, the defendant was cited into municipal court for violating a city ordinance, and therefore was entitled to *de novo* review in circuit court but to Court of Appeals review only on the constitutionality of the ordinance. Had he been cited into municipal court for violating a state law or cited into circuit court in the first instance, he would have been entitled to full *de novo* review in the Court of Appeals. The Supreme Court held that receiving the former entitlement instead of the latter was a burden of constitutional magnitude for purposes of Article I, section 20. If the minor and technical procedural advantages in a criminal adjudication are a burden of constitutional significance then surely the advantage of not being subjected to a criminal adjudication at all is as well.

More importantly, this case, unlike the precedential Supreme Court cases, deals not with a privilege, but with an immunity. If that term from the text of Article I, section 20, means anything at all, it surely applies to the situation at issue here: one driver is subjected to a criminal investigation while other similarly situated drivers are, by virtue of the police officer's exercise of discretion, immune.

The concurring opinion is a more nuanced version of the state's argument. According to the concurrence, in running defendant's license plate, the officer did not distribute a "privilege or immunity" as those terms are used in Article I, section 20. A privilege or immunity, the concurrence argues, is something to which a citizen is "entitled" by statute or constitution. 237 Or App at 366-67. (Sercombe, J., concurring).

> "[A] privilege or immunity under Article I, section 20, must be 'granted' in the sense of achieving that status by legislative or constitutional enactment; it is only official action with respect to that type of privilege or immunity that is constrained by the provision. In this case, there is no law that creates or regulates a privilege or immunity to be free from license plate scrutiny."

*Id.* at 364 (footnote omitted). That is an intriguing and interesting argument, but it cannot possibly be correct. The concurrence's unsupported assertion to the contrary notwithstanding, *id.* at 363 n 1, the term "privilege or immunity"

under Article I, section 20, does not have one meaning with respect to class-based discrimination and a different meaning with respect to systemless treatment of individuals. The text does not permit such a reading: "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." Nor does the concurrence suggest anything in the context, history, or case law that would support such a distinction.

Thus, the necessary implication of the concurrence's interpretation of Article I, section 20, is that the section is simply not implicated in either of its aspects unless the privilege or immunity at stake is a statutory or constitutional entitlement. If that is true, then the officer in this case could freely run the license plates of only African-American drivers, because, in the concurrence's words, "there is no law that creates or regulates a privilege or immunity to be free from license plate scrutiny." By the concurrence's logic, nothing would prevent a district attorney who admits that he or she is driven by racial animus from selectively prosecuting an African-American arrestee but not a white one, because there is no law that creates a privilege or immunity for arrested persons to be free from prosecution. A state agency director presented with more qualified applicants than positions could hire only white people because there is no law that entitles a qualified applicant to a scarce employment opportunity. In sum, the concurrence fails to account for the fact that the public sphere is replete with advantages and disabilities that are not created by constitution, statute, rule, or policy, but that nonetheless cannot be distributed invidiously or *ad hoc*.

The state's second argument is equally unavailing. That argument depends on the following proposition:

"The very nature of police work is highly subjective and discretionary and involves a never-ending series of individualized, nuanced, fact-based choices as to whether and how to pursue an investigation and how to prioritize limited time and resources. A police officer's decision to conduct an investigation is a discretionary decision 'based on a vast array of subjective, individualized assessments' and will

result in like individuals being treated differently particularly given that law enforcement agencies have finite resources. Some people will be subject to a police investigation and some similarly situated people will not.

"* * * * *

"Defendant's position would subject an extremely broad range of police actions to Article I, section 20 review. Every time a police officer takes any action that could be perceived as 'burdening' a person, the person would have a potential Article I, section 20, challenge to that action. For example, a defendant could raise an Article I, section 20, challenge to an officer's decision to approach him on the street to engage in mere conversation and ask for consent to search even though courts have pointedly refrained from subjecting those types of decisions to judicial review. *See* [*State v.*] *Holmes*, 311 Or [400,] 410[, 813 P2d 28 (1991).]"

There are several problems with this argument. First, it cannot survive—at least in this court—in light of Supreme Court precedent: "*Whenever* a person is denied some advantage to which he or she would be entitled but for *a choice made by a government authority*, Article I, section 20, requires that the government decision to offer or deny the advantage be made 'by permissible criteria and consistently applied.' " *Bruner*, 299 Or at 268-69 (emphasis added). Indeed, the state's argument is nearly indistinguishable from the *dissenting* opinion in *Freeland*, in which Justice Jones, joined by no other justice, makes the same policy argument. *Freeland*, 295 Or at 389-92 (Jones, J., dissenting). The only difference between Justice Jones's unsuccessful argument and the state's argument here is that *Freeland* concerned prosecutorial discretion regarding charging procedures, and the present case involves the discretion of police officers regarding the initiation of a criminal investigation. If anything, police discretion should be *more* constrained than prosecutors' discretion, because it is more frequent, more consequential, and more invisible.

Second, contrary to the state's presumption, Article I, section 20, does not prohibit a police officer from making "individualized, nuanced, [and] *fact-based* choices as to whether and how to pursue an investigation and how to prioritize limited time and resources." (Emphasis added.) Article I, section

20, prohibits police officers from making choices that are based on either no facts (that is, haphazard or *ad hoc* choices) or on impermissible facts (for example, race).

Third, *Holmes* and other cases permitting police officers to initiate contact with citizens are not relevant to Article I, section 20, analysis. Requiring consistently applied standards for police-citizen encounters does not limit police officers' ability to have such encounters. It limits their ability to make haphazard, *ad hoc*, or invidiously discriminatory decisions about whom to have encounters with. Thus, for example, if an officer without any suspicion chooses to engage a citizen in mere conversation and has a reason for doing so, that encounter is lawful unless the reason itself is impermissible—for example, that the person looks Middle Eastern or Hispanic.

Finally, it must be emphasized that Article I, section 20, does not deprive state actors of their ability to exercise discretion.

"Discretion to choose a policy is not incompatible with consistency in practice. As one major study of prosecutorial discretion put it:

" 'That there should be consistent and evenhanded treatment of individuals within the framework of our legal system is such a commonly accepted notion that it hardly merits discussion and analysis * * *.'

" 'In its most elementary form, consistent and even handed treatment means that individuals in like circumstances will be treated alike * * *.'

"Abrams, *Internal Policy: Guiding the Exercise of Prosecutorial Discretion*, 19 UCLA L Rev 1, 4 (1971). The challenge for the prosecutor, Professor Abrams continues, 'is to articulate the factors taken into account by him, sometimes intuitively, in exercising his discretion.' *Id.* Or, as Justice Tanzer wrote in another connection while on the Court of Appeals: 'We recognize the wide discretion vested in the commission * * *, but that discretion is not unbridled. It is discretion to make policies for even application, not discretion to treat each case on an *ad hoc* basis.' *Sun Ray Dairy v. OLCC*, 16 Or App 63, 72, 517 P2d 289 (1973)."

*Freeland*, 295 Or at 377 (footnote omitted). For all of the fore-going reasons, I am not persuaded by the state's arguments.

The lead opinion, perhaps recognizing the weak-nesses in the state's arguments, offers one of its own. Accord-ing to the lead opinion, the decision to run defendant's plates was based on facts:

> "[T]he deputy was able to see defendant's front license plate and was able to make out defendant's physical characteris-tics, which would have allowed him to compare the driver to the registered owner. Under those circumstances, the result was that defendant's license plates were run as part of the deputy's normal activity of investigating for stolen vehicles. In the course of that activity, *any* driver who hap-pened to be coming out of the parking lot at that moment would have been subject to the same scrutiny. There was nothing arbitrary or whimsical about the deputy's decision to run defendant's license plates."

*Davis*, 237 Or App at 360-61 (emphasis in original). The first problem with this argument is that the state never made it to the trial court and makes it on appeal only insofar as it uses the term "fact-based" without ever asserting that the dep-uty's decision in the present case *was* fact-based or even men-tioning any of the facts on which the lead opinion relies.

The second problem is more significant. Although the deputy testified that he observed defendant's face and license plate, that he noticed the truck was "a later model pickup," and that the events occurred at a particular inter-section, he never testified or in any way implied that any of those facts were criteria that he applies when deciding when to run a license plate. Indeed, he never even testified that those facts played any role in his decision to execute the investigation in *this* case. To the contrary, he testified on both direct and cross-examination that his decision to inves-tigate defendant was *not* based on criteria or standards. It was "random." When asked, "So you just saw him driving and you thought you would run his license plate?," he responded, "Yes, Ma'am."

Thus, neither the witness, the state, nor the lead opinion presents any reason to conclude, nor any evidence from which we could infer, that the officer's decision to

initiate a criminal investigation of defendant was guided by criteria, policy, or system. The only evidence in the record establishes the exact opposite: that the decision was standardless and *ad hoc*. The witness's testimony affirmatively proves that fact, and to assert that the testimony proves or implies the *contrary* fact—that the decision *was* based on some criteria consistently applied—is, not to mince words, incomprehensible.

"To allay misapprehension, perhaps a further comment is in order." *Freeland*, 295 Or at 382. The misapprehension here may be that the precedent governing this case, and this case itself, call into question the legitimacy of some governmental functions that are universally accepted yet appear to run afoul of Article I, section 20, because they, like Bartlett's choice to run defendant's license, involve the random conferral or denial of privileges. Most obvious are various lotteries, including the official State Lottery. As the state points out, however, there is a difference between "random" and "arbitrary," or, more precisely, between "random" and "haphazard." A truly random distribution of privileges or immunities cannot sensibly be called systemless, haphazard, or *ad hoc*. Those terms all connote, and Article I, section 20, prohibits, distributions that permit absolutely unconstrained discretion. A legitimate lottery or truly random distribution *system* incorporates safeguards to prevent the exercise of discretion. Thus, for example, a *system* under which police officers run license plates of every fifth vehicle, or the first vehicle that an officer not otherwise occupied observes on the hour, or any other system under which an individual state actor's freedom to exercise discretion is constrained by criteria that he or she does not control, would not violate Article I, section 20. Under such systems, every similarly situated citizen would be guaranteed to have access to the privilege or immunity on equal terms—"on the same terms, * * * equally." The record in this case discloses that no such system was in play. For that reason, I partially dissent.[2]

---

[2] There is perhaps one situation in which a police officer may necessarily and therefore lawfully engage in an arbitrary exercise of discretion: when the officer is presented simultaneously with two or more persons, each of whom is identically violating a law and both cannot be apprehended or investigated. The classic example is two cars running the same stop light at the same time. In such a situation, the only way the police officer could avoid an arbitrary choice would be to

Armstrong and Ortega, JJ., and Breithaupt, J. *pro tempore*, join this dissent.

---

apprehend or investigate neither. This case does not present that hypothetical problem.